STUTZ *et al. v.* HANDLEY *et al.*

*(Circuit Court, M. D. Tennessee.    March 18, 1890.)*

1. CORPORATIONS—ACTION AGAINST STOCKHOLDERS—RES JUDICATA.
   Where, in an action against a corporation for the price of machinery, a counter-claim for damages by breach of warranty is disallowed, it is *res judicata* as to the stockholders, and such counter-claim cannot be pleaded in a suit, on the same cause of action, to recover the amount unpaid on their subscriptions of stock.

2. SAME—INCREASE OF STOCK—VALIDITY—ESTOPPEL.
   Where all the stockholders of a corporation assent to the action of a stockholders' meeting in increasing the capital stock, or ratify such action, they cannot afterwards object to such increase that no formal notice of the meeting was given, or that it was held in another state than that in which the corporation was chartered, there being nothing in the charter to prohibit its being so held.

3. SAME.
   Where a corporation organized under Gen. St. Ky. c. 56, has by its charter the power to increase its capital stock, its stockholders, who have acquiesced in such an increase and received the stock issued thereupon, when sued by a creditor of the corporation for the amount unpaid on such stock, are estopped to say that the increase was invalid because it was not published and recorded as required by sections 5 and 6 of the above chapter.

4. SAME—STOCKHOLDERS' LIABILITY FOR UNPAID STOCK.
   After such increase was made in the capital stock, a portion of the new shares was distributed among the stockholders, upon the understanding that they were the owners of the new stock in proportion to the amounts they respectively held of the old, and the certificates issued to them recited that the stock was paid up.    The corporation then became indebted to complainants, who had notice of the increase of the capital stock, but not of the disposition made of it, and afterwards the corporation became insolvent.    *Held,* that the stockholders are liable to complainants for the full amount of the new stock so issued to them, and not paid for; the capital stock being a trust fund for the benefit of creditors.

5. SAME.
   This liability for the full amount represented by the unpaid stock, on the insolvency of the corporation, extends to persons to whom a portion of the new stock was issued as an inducement to purchase bonds of the corporation, though they, too, received certificates reciting that the stock was paid up, since their acceptance and holding of the stock is, in legal effect, a subscription therefor which imports a promise to pay.

In Equity.    Creditors' bill.

*Walter Evans* and *W. L. Gordon,* for complainants.

*E. H. East* and *Pilcher & Weaver,* for defendants.

JACKSON, J.    The complainants, on behalf of themselves and all other creditors of the Clifton Coal Company who may choose to come in, bring this suit to reach and subject to the payment of their debts against the company the amounts remaining unpaid upon shares of the capital stock

of said corporation held and owned by the several individual defendants. The material facts of the case, on which the questions of law arise and the rights of the parties depend, are but little controverted, and are as follows: In June, 1883, the Clifton Coal Company was organized under the general laws of Kentucky. Chapter 56, Gen. St., which went into effect December 1, 1873. After enumerating in detail the purpose, nature, and character of the company's business, and its special powers, the charter provided, among the latter, that "the amount of capital stock shall be $120,000, with power to increase to $200,000 by a majority vote of the shareholders; the times when and the conditions upon which said stock is to be paid in to be determined by the board of directors." By another provision the board of directors were authorized to receive real estate, leasehold estate, mining rights, the right to take timber and right of way, in payment of such parts of subscription for capital stock and at such value as they might deem advisable. The shares were fixed at $100 each. The charter further provided that the indebtedness of the company should at no time exceed two-thirds of its capital stock, and that the private property of its stockholders was to be exempt from all liability for corporate debts. This exemption, however, had no reference to the liability of shareholders on unpaid stock; for by the fourteenth section of said chapter 56 of the General Statutes, under which the corporation was organized, it is provided that "nothing herein shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid installments on stock owned by them, or transferred by them for the purpose of defrauding creditors; and execution against the company may, to that extent, be levied upon the private property of such individual."

The articles of incorporation were duly recorded July 3, 1883, in the county court clerk's office of Hopkins county, Ky., and the company's principal place of business was established at Manington, in the adjacent county of Christian. The capital stock, to the extent of $120,000, as to which no controversy arises in the present suit, was promptly subscribed for, and the company immediately commenced operations upon the lands it had acquired, and proceeded to make large outlays and expenditures for machinery, buildings, merchandise, and labor connected with the mining and selling of coal for steam and grate purposes, to which its business was, for several years, chiefly confined. Early in 1886 experiments were made and opinions were expressed by experts, which led the stockholders and managers of the company to believe that the company's coal could be profitably converted into iron-making coke. On March 31, 1886, a meeting of the stockholders was held, (all the stock being represented in person or by proxy,) at which, after reciting that $50,000 was needed and required by the company with which to build coke-ovens, buildings, and structures of various kinds, and to further develop the property, it was unanimously resolved to issue the bonds of the company to an amount not exceeding $50,000, in sums of $1,000 each, due at 30 years after April 1, 1886, bearing 6 per cent. interest, payable semi-annually, and secured by trust mortgage upon the company's lands,

mines, machinery, buildings, and equipments. The president of the company was authorized to dispose of said bonds when ready, as in his discretion might seem best. The mortgage was duly executed to the designated trustee, and recorded, and bonds of the company to the amount of $50,000 were issued. A sale of these bonds was not promptly effected, and, needing funds to carry on its contemplated and desired improvements, the company procured loans for considerable amounts from certain banks in Nashville, for which its notes, indorsed by several of its larger stockholders, were executed; and, as a further protection to the banks making the loans, said bonds were deposited with them by way of additional collateral security.

On the ———— day of May, 1886, a called meeting of the stockholders was held at Nashville, Tenn., 1,073 of the 1,200 shares being represented in person, when "it was unanimously resolved that the capital stock of the company be increased to $200,000, as authorized by the charter; the purpose for which said stock is issued being the betterment of present plant, and the construction of a new plant for coking purposes." The proceedings of this meeting were taken down at the time in pencil by the acting secretary, but, by inadvertence or oversight, the resolution was not formally entered upon the minute book of the company until 1888, when the omission was discovered. But the fact of the meeting, of the stockholders who were present, and the adoption of the resolution, is fully and clearly established, aside from the pencil memorandum of the proceedings, and the subsequent entry thereof upon the minute book of the company. It was supposed and assumed that the increase of $80,000 to the capital stock of the company, notwithstanding the expressed purposes for which it was made, belonged proportionately to the existing stockholders, and that they could control, dispose of, distribute, and divide the same as they deemed proper. Acting upon this idea, and being advised by a banker who had undertaken to see the company's bonds that, in order to make them "go" more readily, it would be well to add an equal amount of the stock for distribution with each bond, the managing officers of the company, on December 30, 1886, with the knowledge and consent of all the stockholders then holding the original stock of $120,000, prepared, and caused to be circulated, a subscription paper, as follows, viz.: "We, the undersigned, subscribe for the amount set opposite to our names, respectively, to bonds of the Clifton Coal Company, aggregating $50,000. It is agreed that $50,000 of the $200,000 capital stock be distributed *pro rata* among the subscribers to the above bonds." The defendants Handley, Neely, McLester, Talbot, Fletcher, Buckner, James, Erwin, Lannom, D. T. & W. A. Rankin, Murray, Dibbrell & Co., Orr, Jackson & Co., and White, with others not served in the suit, became subscribers to said paper for different amounts of the bonds, to the extent of $45,000, leaving $5,000 thereof untaken. The defendants Handley and Neely were existing holders of large portions of the old stock. The defendant White had been an original stockholder to the amount of $20,000, but had transferred his stock in November, 1885. He, with Neely and Sanford, was an indorser of the company's note for $16,500,

for which about $30,000 of said bonds were hypothecated as collateral security with the bank, (the holder of the note,) of which White was a director. White authorized his name to be signed to said subscription paper for $5,000 of the bonds, upon an understanding and agreement made with Neely and Sanford that they would take up the bonds in a few days, or get some one to take them off his hands in a short time. This arrangement formed no part of the subscription paper, nor was it made as a condition thereto, but was a private understanding between White and said parties, to provide for the payment of said subscription. Neely and Sanford made their note, on demand, for $5,000, which White indorsed, and the bank of which White was a director accepted the note, and paid out for White said amount, to the secretary and treasurer of the company, who delivered to the bank, for White, $5,000 of said bonds, and an equal amount of stock, which the bank was to hold as collateral security for the payment of the note; in which position the matter stood at the filing of his answer herein. It is claimed for defendant White that he did not read or examine the subscription paper to which he authorized his name to be signed. This was his own fault, and constitutes no defense. "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If he will not read what he signs, (or authorizes to be signed,) he alone is responsible for his omission." *Upton* v. *Tribilcock*, 91 U. S. 50. The proof, however, established that he knew of the arrangement to have an equal amount of stock "go" with the bonds. Neither will White's agreement with Neely and Sanford alter his position as the actual holder of the 50 shares of stock issued with the $5,000 of bonds subscribed for by him. So far as creditors are concerned, he remains the holder of said 50 shares, (see *Hawkins* v. *Glenn*, 131 U. S. 326, 335, 9 Sup. Ct. Rep. 739,) and occupies the same position as other defendants who accepted stock with bonds.

Some of the other defendants, not previously connected with the company as stockholders, were led, as they state, to subscribe for said bonds on the supposition that the stock which was to be distributed with the bonds was or would be a part of the old stock, which existing stockholders would surrender for their benefit. But no such representation was made by any agent or officer of the company. Mr. Handley, who was most active in procuring subscriptions for the bonds, appears to have acted in perfect good faith. His representations were to the effect that the company had concluded to bond its property for $50,000; that it had been ascertained that its coal would make coke; that, with the assurance of making coke, the property was first class; that under the charter it was allowed to increase its capital stock to $200,000; that $120,000 was already issued; that a resolution had been passed by stockholders to issue the remaining $80,000 of stock, a part of which would be given with the bonds; that the original $120,000 of stock would have no preference over the new, or increased $80,000; and that in his opinion, with proper management, the stock would be at or above par in two or three years. He be-

lieved, as did other stockholders, that the property of the company was then entirely adequate and sufficient for the payment of said bonds. The mines and property at the time were in good condition. The company had, in the summer of 1886, contracted with complainant Statz for machinery to crush and work the coal, so as to free it of sulphur to such an extent as to make it coke well. It had a guaranty that this machinery would sufficiently rid the coal of sulphur to enable the company to cement it into good coke. If this expectation of making coke, which was in process of trial at the time subscriptions were solicited, had been subsequently realized, the reasonable value of the company's property would have been from $200,000 to $300,000. Handley had this sort of confidence in the future of the company, which he honestly expressed, and the subscribers to the paper of December 30, 1886, were no doubt largely influenced, on taking said bonds, by the hopes and expectations they entertained as to the future value of the stock of the company, which was to be distributed to them along with the bonds. The old stock of the company was at that time rated on the market at from 33 to 50 cents on the dollar.

After paying for the bonds, there was issued to the several subscribers therefor, in January, 1887, equal amounts of the company's capital stock; the receipts for the certificates generally reciting that the stock was "issued with bonds for same amount as per agreement," or "issued to go with $——— bonds of company as per agreement of stockholders," and upon the face of the certificate it was stated that the party named therein was entitled to so many shares "of the fully paid capital stock of Clifton Coal Co., which shares are transferable on the books of the company, either personally or by attorney, upon surrender of this certificate, free from all claims or demands on the part of the company."

All the defendants that thus took stock with the bonds appear upon the company's books as stockholders; all of them still hold said stock; and all, except White, have, either in person or by proxy, voted the same at subsequent meeting of the stockholders. In March and April, 1887, $30,000 of the new or increased stock was distributed *pro rata* among the holders of the old stock, thereby increasing their respective shares or holdings 25 per cent. This increase of their stock was effected by simply surrendering their certificates of old stock, and taking new certificates for the larger amount. Thus the defendant Handley, in lieu of certificate No. 1 of old stock for 200 shares taken up, received, on March 8, 1887, new certificate No. 16 for 250 shares. So with other certificates surrendered by him, making his proportion of the increased stock 86¾ shares. The defendant Neely, who had 300 shares of the old stock, knew of the arrangement to issue an equal amount of stock with the bonds, and to distribute $30,000 of the increased stock ordered by the resolution of May, 1886; and on April 5, 1887, executed his power of attorney to Samuel R. Sanford, authorizing the latter, for him and in his name, to receipt "to the Clifton Coal Company for stock in my name, and transfer and sell the same as if I were there present." Under this power of attorney Sanford surrendered Neely's old certificate for 300

shares, and for Neely, and in Neely's name, receipted for 375 shares of stock, the certificates for which were delivered to Sanford, as agent for Neely, and which Sanford subsequently voted at the stockholders' meeting under a general proxy which he held from Neely to represent his stock. Neely claims that he has never received the new certificates for the increased shares; that Sanford's act in receipting in his name for the new or additional 75 shares was unauthorized, and therefore not binding upon him. In view of Neely's knowledge of the disposition proposed to be made of the increased stock ordered by the resolution of May, 1886; of the fact that the idea prevailed with the old stockholders that this increased stock belonged to themselves; of his general authority previously given to Sanford to represent his stock; of the express language of his power of attorney; and of the fact that Neely's name thereafter stood upon the company's books as the holder of said new or additional 75 shares,—his effort now to disclaim ownership thereof cannot be allowed, and in respect to said 75 shares he must be held to stand precisely upon the same footing as defendant Handley occupied in regard to the extra 86¾ shares received by him.

This disposition which was made of the increased or new stock, in distributing $45,000 thereof to the subscribers for bonds, and $30,000 thereof among the old stockholders, proportionately, does not appear to to have been authorized or directed by any expressed corporate action. The books of the company in evidence show no action, either by the directors or stockholders, on the subject. It is, however, established by the proof that all the old stockholders knew of and acquiesced in the disposition of the new stock as made; that such increased stock was represented and voted at subsequent meetings of stockholders; and that it was recognized and held out to the public as a part of the capital stock of the company.

The debts due the several complainants were contracted by the company after its bonds, as directed by the resolutions of March 31, 1886, were issued, and after its capital stock was increased to $200,000 by the resolution of May, 1886. On January 11, 1887, the company executed its note to complainant Stutz for $3,266.87, payable April 11, 1887, being for the balance due him for certain patented coal-washing machinery furnished the company under contract made in June, 1886, to prepare the coal for coking. He obtained judgment against the company on said note in the United States circuit court at Louisville on March 8, 1888, for $3,466.20, on which execution was duly issued, and returned nulla bona. The complainants Ragon Bros. and Louis Stix & Co. severally obtained judgments against the company in the circuit court of Hopkins county, Ky., for their respective demands, in October, 1887, on which executions were issued, and also returned nulla bona. Their judgments were founded upon claims for merchandise furnished the company, at its request, between March and August, 1887. The debt due Ragon Bros. is fully established, aside from their judgment, the validity of which is attacked for want of proper service. But we think their judgment is valid, the summons having been served upon Allen, the

secretary and treasurer of the Clifton Coal Company. Complainants had no knowledge or notice of the subscription paper of December 30, 1886, under which $45,000 of the new stock was distributed to those who subscribed for bonds, nor of the distribution among the old stockholders of $30,000 of said increased stock; nor does it affirmatively appear that they, or either of them, dealt with and trusted the company upon the faith of that increased stock. But the fact that the capital stock had been increased to $200,000 was made public, and was generally known. The company being unable to pay its debts, the circuit court of Hopkins county, Ky., early in 1888, on the application of certain creditors, placed its property in the hands of a receiver, and the company became and is now hopelessly insolvent. The complainants, on behalf of themselves and all other creditors, seek to compel the several defendants, as owners of the increased capital stock, to pay up the amounts of their respective holdings to the extent necessary to satisfy their debts against the company, claiming that both those who accepted such stock with the bonds subscribed for, and those of the old stockholders to whom portions of the increased stock was distributed, are equally liable, and bound to make such payment, on the broad and well-established principle that unpaid capital stock of a corporation in the hands of original holders is a trust fund for creditors, which the corporation and its stockholders cannot, by any contract, contrivance, or arrangement between themselves, divert from that purpose and application.

No valid objection can be raised to the form of the suit. The bill is properly filed, under the authority of *Hatch* v. *Dana,* 101 U. S. 205. Its object being to reach and subject a trust fund, complainants were not even required to have reduced their claims to judgments, and exhausted their remedy at law after the insolvency of the company. *Case* v. *Beauregard,* Id. 688–690.

The defendants interpose various special and general defenses. They resist the right of complainant Stutz to enforce payment from them, on the ground that he warranted or guarantied the coal-washing machinery which he furnished the company to accomplish certain results which it failed to do; that by reason of such failure there was a breach of his warranty or guaranty, whereby the company sustained great damage, which, it is claimed, exceed his claim, and should defeat his recovery. But this counter-claim for damages, sustained by the alleged breach of warranty or guaranty, was set up by the company as a defense to his suit in the United States circuit court, and was disallowed. It cannot be relitigated in this case, for the reason that the defendants, as shareholders, being represented by the corporation in that suit, have already had their day in court on this question. The judgment in Stutz's favor is conclusive against defendants, until reversed for error or impeached for fraud. It cannot be collaterally attacked, or shown to be erroneous, in this suit. Mor. Priv. Corp. §§ 865, 886, and cases cited; Tayl. Corp. § 737. The defendants who accepted stock with their bonds set up, as a special defense, that the stock which they thus acquired was understood to be, and was in fact, a part of the original $120,000 paid-up,

shares held by the old stockholders, who surrendered the same to go with the bonds, and that such stock is therefore "non-assessable" in their hands. No such contract or understanding, either with the company or old stockholders, is shown; nor is it in any way implied from the terms of the subscription paper of December 30, 1886, under which the bonds and accompanying stock were obtained. The old stockholders in fact made no such surrender for the benefit of those who took the bonds. On the contrary, the stock, which was given to the purchasers of the bonds, was issued before the old stockholders surrendered their old certificates, for the purpose of obtaining new certificates for the larger amount. It is thus clearly established that the stock, which went with the bonds, was a part of the increased, and not of the original, stock. This special defense is not, therefore, established, even if it would have availed anything under the alleged arrangement.

We come next to the consideration of the main defenses interposed by all the defendants, which are: *First*, that the increased stock was void, and neither conferred any rights nor imposed any liabilities upon them; and, *second*, that, if said increase was valid or binding upon them, they cannot, under the circumstances, be required to pay the amounts represented by their several holdings of such stock, in order to satisfy creditors of the company. It is urged that the attempted increase of stock was void, because the stockholders' meeting which authorized it was held in Tennessee instead of Kentucky; because no formal notice thereof was given; and because such increase of stock, being an amendment of the company's charter, was not recorded in Kentucky, and notice of the same published, which it is claimed constituted conditions precedent to any valid increase of the stock. The charter of the Clifton Coal Company contains no express provision limiting the company, in its business transactions, to the territory of Kentucky. On the contrary, it was authorized to establish agencies and transact its business as well without as within the limits of that state. The charter contains no express inhibition against its directors and stockholders holding their meetings out of the state. It is settled that, in the absence of such prohibition in the charter or laws of the state creating the corporation, the directors may hold their meetings and transact the business of the company in another state. *Railroad Co.* v. *Cowdrey*, 11 Wall. 476, 477. Stockholders' meetings, however, should generally be held within the state by which, or under whose laws, the corporation is chartered, in order to be binding upon a dissenting minority. But no valid objection can be made to a stockholders' meeting held in a foreign jurisdiction, provided all the shareholders give their consent to such meeting, or ratify its action. In the present case, every stockholder assented to and ratified the meeting held at Nashville, which directed the increase of stock; 1,073 of the existing shares were represented in person at the meeting, and the two holders of the remaining 127 shares ratified and approved of the action taken by said meeting. Under such circumstances, previous formal notice of the meeting was not necessary, and the increased stock then authorized, having been carried upon the books of the company, cannot

now be questioned, for want of formal notice of the meeting, or because it was held in Tennessee.

The remaining and chief ground on which the invalidity of the increased stock is rested is the failure to record and publish the fact that such increase had been authorized and made. It is contended, or this proposition assumes, that such recording and publication were conditions precedent to any valid increase of the capital stock; and sections 3, 5, and 6 of chapter 56 of the General Statutes of Kentucky are referred to as sustaining this view. By section 3, incorporators are required, before commencing any business other than organization, to adopt articles of incorporation, which, after being signed and acknowledged as deeds are executed, are to be recorded in a book kept for that purpose in the office of the clerk of the county where the company's principal place of business is located. By section 5, notice is to be published at least four weeks in some convenient newspaper, giving the name of the corporation, and its principal place of business; the general nature of the business proposed to be transacted; the amount of capital stock authorized; the time of its commencement and termination; by what officers its business is to be conducted; the highest amount of indebtedness to which the corporation is at any time to subject itself; and whether the private property of the stockholders is to be exempt from liability for the corporate debts. By section 6, the corporation may commence business as soon as the articles are filed for record in the proper office, and its acts are deemed valid if said publication is made. This section further provides that "no change in any of the foregoing particulars shall be valid, unless recorded and published as the original articles are required to be; nor shall any change be made at any time, or in any manner, which would be inconsistent with the provisions of this act." In the case of *Heinig* v. *Manufacturing Co.*, 81 Ky. 300, it was held that the publication and filing of articles of incorporation in the proper office for record, as required by said section, were conditions precedent to the validity of any acts of the corporation. But that decision was expressly overruled in the subsequent case of *Walton* v. *Riley*, 85 Ky. 413–421, 3 S. W. Rep. 605, in which it was held that the operation of section 6 must be restricted and confined, so far as it by implication declares the acts of the corporation invalid, to cases where it is sought to annul the charter or franchise as authorized by the seventeenth section of said act, which provides that "persons acting as a corporation, under the provisions of this act, shall be presumed to be legally organized, until the contrary is shown; and no such franchise shall be declared actually null or forfeited, except in a regular proceeding brought for that purpose." By section 18, it is provided that "no persons, acting as a corporation under the provisions of this act, shall be permitted to set up or rely upon the want of a legal organization as a defense to action brought against them as a corporation; nor shall any person who may be sued on a contract made with such corporation, or sued for an injury done to its property, or for a wrong done to its interests, be permitted to rely upon such want of legal organization."

But aside from the estoppel created by this last section of the act, and independent of the construction placed by the Kentucky court of appeals upon the above-quoted clause of section 6, which this court, upon well-settled rules, should follow, can it be maintained that defendant can successfully question or impeach the validity of the increased stock because of the company's failure to record and publish the facts of such increase? We are clearly of the opinion that they cannot. It is conceded that the corporation had authority to increase its capital stock. This power was not only expressly conferred in and by its charter or articles of incorporation, which authorized the company "to increase its stock to $200,000 by a majority vote of the stockholders," but was clearly implied from the provision of section 6 and the general law. Being invested with authority of law to make an increase of its capital stock, it is settled by the decisions, especially of the supreme court, that neither the corporation, nor stockholders who accept such increased stock, can, after the insolvency of the company, question its validity as against creditors for any failure or neglect on the part of the company to do some other act, the performance of which rested or depended upon itself. There is a clear distinction between the power to make an increase of stock and the formality to be observed or act to be subsequently performed by the corporation in the exercise of such power. A want of power or lawful authority will defeat or render void an attempted increase, while irregularities in the exercise of conceded power is never allowed to invalidate such stock, or to furnish the holders thereof an available defense against liability thereon. Where the power to increase its capital stock exists, and is exercised, the corporation's failure to perform some act devolving upon itself, in connection therewith, such as recording and publishing its action, constitutes an irregularity or neglect of duty of which the state only can complain or take advantage in a direct proceeding against the corporation; but stockholders who have accepted portions of such increased stock are estopped from denying the validity of the increase upon any such irregularity or neglect. This is clearly settled by what are known as the Upton Cases, (Upton v. Tribilcock, 91 U. S. 45; Sanger v. Upton, Id. 56; Webster v. Upton, Id. 65; Chubb v. Upton, 95 U. S. 665; Pullman v. Upton, 96 U. S. 328; and Casey v. Galli, 94 U. S. 673.) The principles announced in these cases are directly applicable to the present on the point under consideration; nor are they in any wise modified or affected by the subsequent decisions of Scovill v. Thayer, 105 U. S. 143, in which the distinction between the want of power to make an increase, and irregularities or informalities in the exercise of a conceded power, as above suggested, is illustrated and applied. By the law of Kansas, the power of the company to increase its stock was expressly limited and confined to double the amount originally authorized. The attempted increase was in excess of that amount. It was held that such excess was void, and conferred no right and imposed no liability upon the holders thereof, upon the ground that there was a want or lack of power on the part of the company to make such an increase. For this reason, those who received certificates for such unauthorized stock, although they at-

tended corporate meetings, were held not to be estopped from disputing its validity. The supreme court, speaking by Mr. Justice Woods, say: "We think he [the holder of such stock] is not estopped to set up the nullity of the unauthorized stock. It is true that it has been held by this court that a stockholder cannot set up informalities in the issue of stock which the corporation had the power to create;" citing the *Upton Cases.* "But those were cases where the increase of the stock was authorized by law. The increase itself was legal, and within the power of the corporation, but there were simply informalities in the steps taken to effect the increase. These, it was held, were cured by the acts and acquiescence of defendant; but here, the corporation being absolutely without power to increase its stock above a certain limit, the acquiescence of the shareholder can neither give it validity nor bind him or the corporation." The reason for the distinction thus indicated is founded upon the principle that a corporation has no inherent authority of its own motion, or by its own action, to effect fundamental changes in its constitution or organic law, such as an increase of its capital stock involves. It is an essential prerequisite or condition precedent to the validity of such a change that the sovereign by whom the corporation is created, or under whose law it is organized, shall give its consent thereto, either in the company's charter, or by some general or special act. But, when such authority is conferred, those who accept stock under the exercise of the power by the corporation are not allowed to shield themselves from liability in respect thereto by setting up the failure on the part of the company or of themselves to perform any subsequent act or duty resting within its or their own control, such as making, recording, or publishing a certificate of such corporate action. This court had occasion to consider and apply this distinction between lack of power on the part of the corporation and the mere non-performance of acts devolving upon itself or within its own control in the case of *Winters* v. *Armstrong*, 37 Fed. Rep. 508–520, where the subscribers for increased capital stock were relieved because the corporation failed and ceased to exist before it had acquired the requisite power to make the increase. In *Veeder* v. *Mudgett*, 95 N. Y. 295, the facts were that the corporation was organized in 1868, with its capital stock fixed at $200,000. No certificate of its incorporation was made and recorded as required by the law. In 1869 a resolution was passed by the company's directors increasing the stock to $300,000. At an informal meeting of the stockholders a vote was passed approving this action of the board of directors. This meeting of stockholders was not called, nor was the vote approving the increase passed by two-thirds of the stockholders, as the law required. No certificate of this increase was made and filed for record as required by section 22 of the act under which the company was organized, and which provided that "when so filed the capital stock," etc., "shall be increased." The increased stock was issued, and the holders of a portion thereof were, upon the insolvency of the corporation, sought to be made liable on the same. It was urged in defense that, in view of the requirements of the law, and of the entire absence of any compliance therewith, said increase of stock was

not valid, and that the holders thereof were not estopped from disputing its invalidity. After referring to the failure of the corporation to observe the requirements of the statute, the court say, (page 310:)

"The attempted increase was therefore illegal, but the respondent insists that nevertheless, as against the creditors of the company, the defendant stockholders, by accepting their proportion of the increased stock by voting for its increase by taking dividends upon it, and holding it out to those dealing with the company as an actual component of its capital, are estopped from denying the legal validity of the increase, and must be held responsible, as if it was valid. The authorities for this doctrine are numerous and strong. *Eaton* v. *Aspinwall*, 19 N. Y 119; *Chubb* v. *Upton*, 95 U. S. 665; *Aspinwall* v. *Sacchi*, 57 N. Y. 331; *Railroad Co.* v. *Cary*, 26 N. Y. 75; *Kent* v. *Mining Co.*, 78 N. Y. 159; *Sheldon H. B. Co.* v. *Eickemeyer H. B. M. Co.*, 90 N. Y. 613. The answer made to them is that an act absolutely and wholly void, because under the law incapable of being performed, cannot be made valid by estoppel. This is true where under the law there is an entire lack of power to do the act which is brought in question. The distinction is well illustrated in *Scovill* v. *Thayer*, 105 U. S. 143. Under the law of Kansas, no company like that then before the court could increase its capital to more than double an amount originally authorized. The capital was sought to be increased in excess of that amount. As against creditors, it was claimed to be a valid increase, by the operation of an estoppel, but the court ruled otherwise, and justly; for the very foundation of an estoppel, the misleading of creditors to their injury, was wanting. The latter knew, and were bound to know, that no power existed to so increase the capital, and therefore that it was not increased; and hence they were not and could not be misled. But where, as in the present case, the abstract power did exist, and there was a way in which the increase could lawfully be made, and the creditors could, without fault, believe that the increase had been lawfully effected, and the necessary steps had been taken, then the doctrine of estoppel may apply, and the increased stock be deemed valid, as to the creditors."

So it is said in Morawetz on Private Corporations, § 763, that "if a corporation is authorized by law to increase its capital stock, upon complying with certain prescribed forms or conditions, and the corporation or its agents appear to have endeavored to comply with the prescribed forms or conditions, and have in fact increased the company's capital stock by issuing new shares, on the assumption that the legal right to increase the capital stock had been acquired, and if the holder of such new shares has acted as a shareholder, and enjoyed the rights of a shareholder, then the creation of such new shares will be recognized by the courts, and given effect according to the intention of the parties, although the statutory forms or conditions were not complied with, and no legal right to create the new shares was in fact obtained." *Chubb* v. *Upton*, 95 U. S. 668, is to the same effect, where it is said that, "if it be conceded that its increased stock was but *de facto*, and that it could have been annulled or suppressed by the action of the attorney general, as acting under an irregular organization, the defendant derives no aid from the admission. The cases cited are clear to the point that he cannot make the objection, but must perform the engagement he has made."

Under these authorities, and under the provision of section 18 of chapter 56 of the General Statutes of Kentucky, and the construction

placed by the court of appeals of that state upon section 6 of said chapter, it is clear that defendants cannot impeach the validity of the increased stock of the Clifton Coal Company, held by them, respectively. That increase is valid and binding upon them, both as to the corporation and its creditors, where claims have arisen since such increase was authorized and directed.

The second and remaining general ground of defense to be considered is that, even if the increased stock was valid, or its validity cannot be impeached by the holders thereof, still the defendants who accepted and hold portions of such new stock cannot, under the circumstances of this case, be required to pay up the amounts represented by their shares; because the holders made and entered into no contract or agreement to pay for the same, and because it is not shown that complainants, or any other creditor on whose behalf the suit is brought, either trusted or dealt with the company upon the faith of this increased stock, or of defendant's ownership thereof. How far is this defense, which presents the most important question in the case, available to the old stockholders, such as defendants Handley and Neely, to whom $30,000 of the increased stock was distributed proportionately? And how far is it available to those defendants who accepted portions of such new stock along with the bonds they subscribed for? The former class stand upon a somewhat different footing from the latter, although neither understood or expected that they would or could be called upon, in any event, to pay for the new shares of stock received by them respectively. The old or existing stockholders, without any contract or agreement with the corporation, but under a tacit understanding among themselves, and upon the idea or assumption that the increased capital stock belonged to them, distributed 300 shares thereof "*pro rata*" among themselves, while the subscribers for the company's bonds, with the assent of the old stockholders, received of such increased stock shares equal in amount to their bonds. The old stockholders were clearly mistaken in supposing that all or any portion of the new stock belonged to, or could be appropriated by, them as "non-assessable" or paid-up stock; nor can they, after the insolvency of the company, escape liability to creditors for the amounts represented by the increased stock accepted and held by them, upon the ground of such mistake, or for the reason that the certificates which they received for the new shares recited that the stock was fully paid up.

There is nothing in the charter of the Clifton Coal Company, or in the General Statutes of Kentucky, under which the corporation was organized, sanctioning or authorizing its members to appropriate any portion of its capital stock, without paying or being liable to pay therefor. On the contrary, the charter implicitly prohibits such a distribution in providing that the directors may determine the times and conditions upon which the stock is to be paid in, and in allowing the company to receive real and household estates, mining rights, etc., in payment for stock; while section 14 of chapter 56 expressly declares that nothing in the act conferring corporate franchises, or permitting the organization of corpora-

tions themselves, "shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid installments on stock owned by them." But aside from this provision of the statute, which is nothing more than the legislative recognition of the general principle enforced by courts of equity, it is well settled by the authorities that the old stockholders (Handley and Neely) in the present case, who accepted and held portions of the increased stock, cannot claim exemption from liability thereon, as against creditors, especially those who have dealt with the company in ignorance of the arrangement that such stock was treated and received as fully paid up, when such was not the fact. A corporation cannot legally give away its capital stock, nor distribute the same, among shareholders without consideration. "The rule that shares cannot lawfully be declared paid up, unless their par value has been contributed to the company's capital, rests upon the equities existing between the shareholders forming the company, and upon the equitable rights of outside parties, who deal with the company in the faith of the capital indicated by its charter." 1 Mor. Priv. Corp. § 427. "It is manifestly incompetent for the corporate management to agree with a shareholder that shares, issued to him for a nominal consideration, shall be treated as fully paid up." Tayl. Corp. § 545, and cases cited.

The wholesome and well-established doctrine that the capital stock of a corporation is a trust fund for the payment of corporate debts is utterly inconsistent with the idea that original holders of stock can, by any contract, contrivance, or device between themselves, or between themselves and the corporation, acquire and retain shares in the company without incurring liability to pay therefor, whenever such payment is needed to meet the demands of creditors. The original holders of unpaid capital stock are affected with duties towards creditors which constitute or create trust relations between them, to the extent that such unpaid shares held by the former are required to satisfy the claims of the latter. "The law is accordingly settled that any condition or arrangement attached to the contract of a shareholder in a corporation, which, if carried out, would lessen the amount of capital held out to creditors as their security, is a fraud upon creditors, and will therefore be denied effect." 2 Mor. Priv. Corp. § 842, and cases cited.

It is not material that there was no express contract or agreement on the part of said defendants to subscribe and pay for the increased stock received by them, or that the certificates issued to them therefor recited that the shares were paid up. The untrue statement in the certificate, that the shares are paid up, cannot discharge the shareholder, who has not paid for the same, from liability thereon. It has no greater effect than the unauthorized delivery of an untrue receipt to a person indebted to the corporation. The debtor of the company, obtaining such a receipt without actual payment, would certainly not be discharged, even as to the corporation. Neither can the original holder of unpaid shares avoid liability therefor, by reason of the false recital in the certificate issued to him that the stock was fully paid up. A *bona fide* purchaser or transferee, without notice from the original holder of such a certificate,

would, no doubt, stand upon a different footing; but the defendants Handley and Neely, as the first holders, respectively, of 80 and 75 shares of the increased stock, clearly occupy no such position. While they entered into no express undertaking to pay for these shares, but intended and expected to receive and hold the same as fully paid, in accordance with the recital of the certificates issued therefor, still this acceptance and holding of such certificates until the insolvency of the company operates to impose upon them the legal obligation to pay up said shares in order to discharge the demands of creditors. In *Upton* v. *Tribilcock*, 91 U. S. 47, 48, the shareholder had paid 20 per cent. of the shares, and the certificate, issued to him for the whole amount, had stamped across its face the word, "Non-assessable." The court held that "the acceptance and holding of a certificate of shares in an incorporation makes the holder liable to the responsibilities of a shareholder." The legal effect of the certificate was to make the remaining 80 per cent. payable on demand. The court said:

"We see no qualification of this result in the word ' non-assessable,' assuming it to be incorporated into and to form a part of the contract. It is quite extravagant to allege that this word operates as a waiver of the obligation, created by the acceptance and holding of a certificate, to pay the amount due upon the shares. A promise to take shares of stock imports a promise to pay for them. The same effect results from an acceptance and holding of a certificate."

The rule thus laid down, which was reaffirmed in the subsequent cases of *Sanger* v. *Upton*, 91 U. S. 64; *Webster* v. *Upton*, Id. 67, 71; *Chubb* v. *Upton*, 95 U. S. 666; and *Hawley* v. *Upton*, 102 U. S. 316,—establishes the liability of defendants Handley and Neely for the 86 and 75 shares of the new stock, for which they respectively accepted and held certificates.

On behalf of all the defendants who accepted and held certificates of the new stock, "distributed" to them along with bonds, it is urged that they cannot be held liable thereon to creditors, because they were in no sense subscribers for such stock, and entered into no contract and assumed no obligation to pay therefor. It is claimed for them that neither the company nor the old stockholders could enforce such a liability upon or against them, and that creditors can assert no better or superior rights. Assuming that the subscription paper of December 30, 1886, which stated that "it is agreed that $50,000 of the $200,000 capital stock be distributed *pro rata* among the subscribers to the above bonds," constituted a contract between the subscribers for the bonds and the corporation, rather than an agreement between themselves, made with the consent and approval of the old stockholders, are creditors, who dealt with the company without notice or knowledge of that arrangement, precluded from recovering of defendants who accepted and held certificates of stock thereunder? The property of the company was considered ample security for the payment of the bonds, and the distribution of stock to the subscribers for the bonds was not in fact, or by the terms of the subscription paper, in any proper sense a sale of such stock at and for its market value.

In the well-considered case of *Morrow* v. *Steel Co.*, 10 S. W. Rep. 495, (decided by the supreme court of Tennessee in 1889,) it was held that an agreement by which persons organizing a corporation are to have bonds of the corporation to an amount equal to the stock subscribed for, secured by mortgage on the corporate property, is illegal and void, and cannot be enforced against the corporation, even though the rights of no creditors of the corporation are involved. It was said by the court that "whether this 'basis of organization' be construed to be a contract whereby each subscriber to the stock was to be given a bond as a bonus, or each subscriber to the bonds was to be given paid-up stock as a bonus, or as an agreement by which each contributor to the capital stock was to receive the obligation of the company, secured by a primary mortgage, that he should be repaid the amount of his subscription with interest, such agreement would clearly be illegal and ineffective as to existing or subsequent creditors of the corporation, upon the ground that the payment for the stock was unreal and simulated, or that the bond had been issued upon no consideration;" citing *Sawyer* v. *Hoag*, 17 Wall. 610; and *Scovill* v. *Thayer*, 105 U. S. 143. And after approving of the principle of these cases, that the unpaid stock of a corporation constitutes a trust fund for the benefit of general creditors, which can by no contrivance or device be released, the court held that the legal effect of the scheme, by which every subscriber was to have bonds, and also stock of the company, each to the amount of the subscription, was to throw all the risks and hazards of the business upon the public, who should deal with the corporation; while the contributors were to reap all possible gains, and be secured against loss in the event the enterprise proved unprofitable. Such a contract was considered invalid, even as to the corporation. But it was suggested, or rather left an open question, (by the learned judge delivering the opinion of the court in that case,) whether an organized and going corporation might not make such a disposition of its bonds and stock; citing in that connection Morawetz on Private Corporations, § 306, in which it is said:

"It is evident, therefore, that the issue of certificates for paid-up shares to a shareholder whose shares have not in fact been paid up is unauthorized. It would be a direct infringement of the rights of all existing shareholders in the company, and a source of fraud upon persons giving the company credit. * * * However, after the capital of a corporation has been reduced by losses, it would not be a wrong against the existing shareholders to issue certificates for paid-up shares on payment of less than their par value. Under these circumstances, fairness and equality would merely require that the new shares be issued at their actual or market value. If shares in a corporation could in no case be issued at less than their face value, it would be practically impossible to increase the capital of a corporation by a sale of new shares after the value of its shares had fallen below par."

It will be noticed that a sale of new shares at less than par, under the circumstances stated, would not be a wrong against existing shareholders. Whether it would be good against creditors is a different question. So far as the right of creditors are involved and affected, precisely the same objection exists against the subscriber for bonds of corporations taking increased stock as a bonus that exists against the taking of orig-

inal stock as a bonus, on one and the same consideration. In each case the party thus dealing with the corporation seeks, on the payment or contribution of one amount, to acquire both a debt against the company and a *pro rata* share and interest in the enterprise, without risk to himself. The legal effect of such an arrangement, either as to increased or original stock, is an undertaking on the part of the corporation to return or repay his contribution or loan, with interest, confer upon him all the rights of a shareholder, and exempt him from all obligation to account for the trust fund represented by his share. The transaction casts upon the public, dealing with the corporation, all the risks and hazards of the enterprise; and allows the holder of the shares, while reaping all the benefits and advantages of its success without liabilities for losses, to call for and require a repayment of his advance. The settled principles of the law, which impress upon the capital stock of a corporation the character of a trust fund, and establish trust relations between holders of such stock while unpaid, and creditors of the corporation, will not sanction such a contract when the rights of creditors are involved. In this respect no valid distinction exists between original and new stock. The supreme court in *Chubb* v. *Upton*, 95 U. S. 667, places the increased stock of a corporation upon the same footing as the original stock, and has steadily refused, as against creditors, to recognize any disposition thereof which could not have been made of the original stock. The settled doctrine of that court is that creditors without notice are not affected by any arrangement or device between the corporation and those accepting shares of its stock which fall short of actual payment therefor in good faith.

In *Sawyer* v. *Hoag*, 17 Wall. 618, 619, the transaction was valid as between the corporation and the shareholders, but was held invalid as against the representatives of creditors. So in *Hawley* v. *Upton*, 102 U. S. 316, the shareholder's express written agreement with the corporation was to pay $200 (or 20 per cent. of its par value) for 10 shares of the increased stock. As between him and the corporation, this would have been held valid, but as against creditors it was held not binding, and he was required to pay up the remaining 80 per cent; the court saying that, "as the company could not sell its stock at less than par, what was done amounted in law to a subscription for the stock, and nothing else. It is true the stock he took purported to be non-assessable; but that, in law, could only mean that no assessment would be made beyond the percentage he had specially bound himself to pay, unless the legal liabilities of the company required it." All the *Upton Cases* dealt with increased or new stock, and the supreme court, in favor of the representative of creditors, disregarded the special contracts made between the corporation and the shareholders, and compelled the latter to pay in full for their shares. To the same effect, see the well-considered case of *Flinn* v. *Bagley*, 7 Fed. Rep. 785. In harmony with the principle enforced in these cases is the decision of the Kentucky court of appeals in the case of *Haldeman* v. *Ainslie*, 82 Ky. 395, in which the capital stock of the corporation, organized under the same general law as the Clifton Coal

Company, was fixed at $1,200,000; and it was provided, by section 5 of the articles of incorporation, that each subscriber, upon executing his note for $1,000, payable in bank, and paying $500 in cash, should become entitled to paid-up stock of 400 shares, ($40,000.) The private property of stockholders was exempt from liability for corporate debts, and the charter further provided that "the highest amount of indebtedness to which the corporation is at any time to subject itself shall be the sum of $15,000." The managing officers contracted debts far beyond this limit, and the corporation became insolvent. The court held that creditors could compel the payment of the entire stock, (of $1,200,000,) if necessary to satisfy their demands. The court says:

"The effect of the limitation upon the amount to be paid by the subscribers for their stock would not exempt them from liability to a creditor who had dealt with the corporation in ignorance of the articles of association, limiting the amount of the indebtedness to be created by the corporation or those conducting it. * * * The public had the right to believe that each subscriber, taking 400 shares of stock at $100 per share, had either paid up his stock, or was liable for the amount; and when trusting the corporation upon the faith of its ability to pay, and without any knowledge as to the restrictions contained in the contract between the stockholders, a creditor of the corporation could compel the payment of the entire stock, if necessary to satisfy his demand."

I am unable to see any difference in principle between making a stockholder pay a larger per cent. on his shares than he has expressly agreed and undertaken to pay, and compelling a shareholder to pay up the whole amount represented by certificates which he has accepted, and holds under contract as paid-up shares, but which have not in fact been paid. If the unpaid balance may be reached and subjected to the payment of corporate debts, in disregard of the contract, why may not the unpaid whole of outstanding shares be likewise reached and subjected, notwithstanding the agreement that they should be treated or considered as fully paid?

The recital in the certificates issued to and received by defendants, that the shares were "fully paid up, and free from all claims and demands on the part of the company," cannot relieve them, under the authority of *Hawley* v. *Upton*, 102 U. S. 316, from liability to creditors, even if valid against the corporation. The case of *Coit* v. *Amalgamation Co.*, 14 Fed. Rep. 12–18, and the same case on appeal, reported in 119 U. S. 343–347, 7 Sup. Ct. Rep. 231, cited by counsel for the defense, is not in conflict with the foregoing authorities. In that case there was a new issue of stock, connected with the acquisition by the corporation of certain real estate, the title to which failing, or proving defective, the new stock was thereupon called in and canceled, and the transaction rescinded. The creditors, who after the cancellation of the transaction and this new stock sought to compel parties to whom portions of it were issued to pay up the same, knew of and acquiesced in the whole transaction. Mr. Justice BRADLEY said, in deciding the case on the circuit, that "if a legal presumption did not arise that Mr. Coit [the creditor] knew of the transaction at that time, and there was no proof that he

knew of it, it would present a different case." Coit's claim originated before the temporary increase of the stock, and the supreme court, in passing upon the case, (119 U. S. 347, 7 Sup. Ct. Rep. 234,) say: "Had a new indebtedness been created by the company after the issue of the stock, and before its recall, a different question would have arisen." In the subsequent case of *Bank* v. *Alden*, 129 U. S. 372, 9 Sup. Ct. Rep. 332, the supreme court again held that a creditor of a corporation, who had knowledge of and assented to a transaction between the corporation and a stockholder at the time when it took place, could have no resort against such stockholder. But these cases have no application here, for it does not appear complainant had any knowledge of, or gave any consent to, the arrangement under which the increased stock was distributed to subscribers for bonds and to existing stockholders. The complainants are not required to go further, and show affirmatively that they knew of the stock being increased, and treated or dealt with the corporation upon the faith that it had actually been or would be paid. The increase of the stock was made public, and those thereafter dealing with the company will be presumed to have done so in reliance upon such stock as a part of the corporate capital pledged for their security. *Haldeman* v. *Ainslie*, 82 Ky. 395; *Pullman* v. *Upton*, 96 U. S. 331; and *Adderly* v. *Storm*, 6 Hill, 629. In this last case it is said:

"It seems to have been thought a matter of some moment that the plaintiff, so far as appeared on the trial, had not examined the stock ledger before he gave credit to the company. But there are other ways in which he may have learned that the defendants were stockholders, and, besides, I do not see that the liability of the stockholder has been made to depend on the fact that the creditor knew he could be reached. * * * As the defendants were in fact stockholders, they must answer to the plaintiff, although he may not have known at the time he trusted the company that the defendants could be reached."

As stated in *Haldeman* v. *Ainslie*, 82 Ky. 395, the public had the right to believe that each holder of the increased stock had either paid for his share or was liable for the amount; and a creditor who trusts the corporation upon the faith of its ability to pay, and without any knowledge of the contract or arrangement between the stockholders and the company under which the stock is treated as paid up, may compel shareholders to make actual payment. The statement in section 833 of Morrawietz on Private Corporations, that subsequent creditors would have an equitable claim to have new shares paid up in full, "if it was expressly represented to the creditors that the new shares had actually been issued," is hardly warranted by the authorities. I have found no case which imposes upon the creditors the burden of showing any such express representation that the new shares had actually been issued, as a condition to his right to compel stockholders to pay up their unpaid shares. It being settled by the authorities referred to that the coal company could not lawfully give or distribute to defendants paid-up shares of its increased stock as a bonus to go with its bonds subscribed for by them, and it being further settled that the acceptance and holding of certificates for such shares of stock is, in effect, the same as a promise to take shares, which

imports a promise to pay for them whenever the liability of the company required it, (102 U. S. 316,) or, as expressed by Mr. Justice BRADLEY in *Coit* v. *Amalgamation Co.*, 14 Fed. Rep. 18, "that stock issued to a party which he receives is the same as though he had subscribed for it," the conclusion is inevitable that defendants are severally liable for the unpaid shares of capital stock received and held by them so far as may be necessary to satisfy the corporate debt. After the insolvency of the corporation, it will not avail the defendants that they were induced by mistake or fraud to accept and receive the stock in question, nor can they now, after the rights of creditors have attached, disclaim its ownership, so as to escape liability. Even before suit commenced, the corporation could not have released them, so far as creditors were concerned. 2 Mor. Priv. Corp. §§ 840, 841; Tayl. Corp. § 744; *Upton* v. *Tribilcock*, 91 U. S. 47, 48, 50, 54, 55, and cases cited.

Counsel for the defense called the attention of the court to several English cases, holding that shareholders, even as against creditors of the corporation, are entitled to stand upon their contract with the company. Those cases may not be specially discussed or reviewed, as the decisions of the supreme court of the United States and of Kentucky, under whose laws the Clifton Coal Company was organized, proceed upon a different principle. The case of *Christensen* v. *Eno*, 106 N. Y. 97, 12 N. E. Rep. 648, is especially pressed as sustaining defendants' position. That case is certainly an authority in favor of defendants, but it is not in harmony with the authorities above referred to. The facts of the case were that the Illinois & St. Louis Bridge Company issued to Eno 25 shares of its capital stock, upon which 40 per cent. was not paid, but was credited as paid when the stock was issued. The complainant, a judgment creditor of the corporation, sought to compel Eno to pay up the unpaid 40 per cent. towards the satisfaction of his debt. The court, following the English cases cited by counsel for defendant, and without even referring to the decisions of the supreme court of the United States, held that the creditors could not recover, because Eno had entered into no contract with the company to pay the unpaid 40 per cent. I am unable to reconcile this decision with the principles announced and applied by the supreme court in the above-cited *Upton Cases*, which are binding upon and should be followed by this court.

The conclusion of the court is that all the defendants are liable to the complainants, and other creditors whose debts originated after the stock was increased, who may come in for the amount of their respective holdings of such increased stock, which must be paid up in full if necessary to satisfy such corporate liabilities. The amounts for which the defendants are thus liable, being a trust fund equitably applicable to the payment, not only of complainants' claims, but those of all other claims of the company in like position, such other creditors should have an opportunity to come in and share equally with complainants in said funds or assets. To this end the master is directed to give 30 days' notice by publication made in some newspaper published in Nashville, Tenn., and in a newspaper published at or near the company's principal place of business,

for other creditors to come in, and a reference is directed to the master to report the debts of all such creditors as may chose to come in and claim the benefit of the suit and the decree against the defendants. A decree will be accordingly entered, declaring the liability of defendants for the amount of their respective holdings of said increased and unpaid stock, with costs of this suit; and, upon the ascertainment of the claims entitled to payment out of said funds, execution as at law will issue against the several defendants for the amount due from each, until such claims are fully paid.