[No. 2475.  Decided February 23, 1897.]

MANHATTAN TRUST COMPANY OF NEW YORK, *Respondent*, v. SEATTLE COAL AND IRON COMPANY, *Respondent*, MURPHY, GRANT & CO. *et al.*, *Appellants*.

RECEIVERS — APPOINTMENT FRAUDULENT AS TO CREDITORS — ESTOP-
PEL — RIGHT OF GENERAL CREDITORS TO PREFERENCE OVER MORT-
GAGEE — CHATTEL MORTGAGES — RECORD — SUBSCRIPTIONS TO COR-
PORATE STOCK — OVERVALUATION OF CONSIDERATION.

Although the object in obtaining a receivership for a corporation may be to hinder and delay its creditors, such creditors are estopped from attacking the proceeding as fraudulent when they have acquiesced therein for months, had dealings with the receiver subsequent to his appointment, and have filed their petitions in the receivership proceeding seeking the enforcement of their claims out of the trust funds.

Where bondholders have obtained the appointment of a receiver for an insolvent corporation upon the condition that the receiver pay all amounts due for supplies and materials purchased and used in operating the corporate property, and the receiver so appointed has continued to operate the business for a couple of years the same as it had been conducted prior to his appointment, the creditors who have furnished supplies and materials used in the maintenance of the property are entitled to a preference over the bondholders, such as is accorded in the case of railway receiverships.

The inclusion of personal property in a real estate mortgage and the recording of the instrument in the records devoted to that class of mortgages does not, under Gen. Stat., §§ 1648, 1649, afford constructive notice of any lien upon the personal property, and is void as to creditors.

The transfer of about $70,000 worth of coal lands in payment of $5,000,000 stock subscription in a corporation is, in the absence of any explanation, such an apparent overvaluation of the property as to be fraudulent.

Where the bondholders of a corporation are identical with its original stockholders, the lien of the mortgage securing the bonds should be postponed in favor of the general creditors of the corporation.

Appeal from Superior Court, King County.—Hon. J. W. LANGLEY, Judge.   Reversed.

*Bausman, Kelleher & Emory, Donworth & Howe*, and *Strudwick & Peters*, for appellants:

The court had made it a condition, which the trust company had accepted, that supply and material claims should be given a preference over the bonds out of any moneys of the receivership. The court has a right to impose such conditions, and at all events the foreclosure plaintiff, if he accepts it, cannot complain. *Fosdick v. Schall*, 99 U. S. 235; *Burnham v. Bowen*, 111 U. S. 776; *Union Trust Co. v. Morrison*, 125 U. S. 591.

The foreclosure of the trust company against the coal and iron company was a collusive one to hinder and delay the unsecured creditors, and fraudulent and void for that reason.   *Scott v. Farmers' Loan & Trust Co.*, 69 Fed. 17; *Alabama National Bank v. Coal & Ry. Co.*, 19 South. 404.

The organization and attempted capitalization of the corporation known as the Seattle Coal & Iron Company was, in law, fraudulent as to every creditor of the Seattle Coal & Iron Company, and was characterized by bad faith, in the intentional overvaluation of property exchanged for the capital stock of said corporation.   The fraudulent nature of the scheme consisted in the gross, palpable and intentional overvaluation of the property given by Franklin M. Jones

and others, his associates, for the five million dollars of capital stock of the Seattle Coal & Iron Company. To exchange property costing seventy thousand dollars for stock of the nominal value of five million dollars fully paid up is a transaction going much further than anything of the same nature which any court of justice has ever sustained. No capital stock watered to this extent has ever been held to be paid up, when the rights of honest creditors of the corporation were involved. Such an overvaluation is cogent evidence of fraud, and, if unexplained, is conclusive evidence thereof. There has been no attempt on the part of the plaintiff, or of any bondholders or stockholders, to explain this transaction. *Lloyd v. Preston*, 146 U. S. 642; *Hooper v. Central Trust Co.*, 32 Atl. 505; and cases cited by the court in its opinion.

*Struve, Allen, Hughes & McMicken*, for respondents:

Where creditors of a corporation for several months acquiesce in the appointment of a receiver and pursue their remedies thereunder, they cannot afterwards question the appointment of the receiver, unless it is absolutely void. *Dickerson v. Cass County Bank*, 64 N. W. 395. A creditor, having received dividends from the receiver, is estopped from denying the validity of his appointment. *Greeley v. Provident Savings Bank*, 15 S. W. 429; *Scott v. Duncombe*, 49 Barb. 73; High, Receivers ( 2d ed.), § 235.

Where stock has been issued for property taken at an overvaluation, the transaction is upheld as legal, valid and binding on all parties and persons unless that overvaluation is shown to have been fraudulent. Cook, Stock and Stockholders ( 2d ed.), § 47; *Du Pont v. Tilden*, 42 Fed. 87; *Phelan v. Hazard*, 5 Dill. 46; *Coffin v. Ransdell*, 110 Ind. 417; *Coit v. Gold Amalgam-*

*ating Co.*, 119 U. S. 343; *Turner v. Bailey*, 12 Wash. 634.

Counsel for appellants attempted to place their claims on the basis of supplies furnished to keep the coal company a going concern. It is a sufficient answer to say this is not a railroad company. On account of the public nature of railroads and their relations to the government and the public, they are *sui generis*, and the doctrine of preference, for this reason, applies to them alone. *Hooper v. Central Trust Co.*, 32 Atl. 513; *Wood v. Guarantee Trust, etc., Co.*, 128 U. S. 417; *Snively v. Loomis Coal Co.*, 69 Fed. 204.

The opinion of the court was delivered by

REAVIS, J.—In 1887 the defendant, the Seattle Coal & Iron Company, was organized as a corporation, in King county, with its principal offices at Seattle, for the purpose of purchasing and leasing lands containing coal, iron ore and other minerals; and also of improving and developing such mineral lands as it might own or lease, of opening mines and selling the products thereof, and, in conducting such business, of owning houses, machinery and other personal property, docks, wharves, vessels, tugs and barges; and generally to do anything in connection with such business. The capital stock of such corporation was made $5,000,000. On the 30th of September, 1887, the stock was fully subscribed. Four shares were subscribed by four persons, each taking one. Four thousand nine hundred and ninety-one shares were subscribed by D. H. Gilman. Four other shares were subscribed by four individuals, by Gilman as agent. Before the organization of this corporation Mr. Gilman negotiated with, and purchased of L. B. Andrews,

certain coal lands in King county for about $70,000, he, by direction of Mr. Gilman, making a conveyance of the property to Franklin M. Jones, trustee. On September 20, 1887, Jones addressed a communication to the board of trustees of the Seattle Coal & Iron Company, saying:

"As common trustee for myself and others, I hold the legal title to a large amount of land in King county, Washington territory, containing several well defined veins of coal thereon, and I am also the owner of certain valuable interests in other coal and mining lands in said territory; . . . I hereby offer to your company to convey to it (with covenants of further assurance) all my present right, title and interest to all of said lands described as follows:" (here is inserted a description of the lands purchased from Andrews); and continuing: "for the sum of $5,000,000, for which the company is to make, execute and deliver to me its negotiable promissory note for said sum payable at the banking house of Jameson, Smith & Cotting, in the city of New York, on demand, with interest at six per cent. per annum, and in addition thereto $320,000 of coupon bonds of your company of an issue not exceeding $1,000,000, bearing five per cent. interest, and to be secured by a mortgage upon all of the coal lands, mines, plant, and property of every description of your company, now owned or at any time hereafter to be acquired."

Upon the receipt of this offer the following resolution was adopted:

"That this company hereby accepts the proposition this day submitted to it by Mr. F. M. Jones of New York city, and the president and other officers of this company are instructed to do any and all acts and execute and deliver all papers necessary and proper to carry out and comply with the terms of said proposal, and especially to prepare, execute and deliver all such bonds as are necessary to make the agreed payment for the conveyance of such properties. *Resolved fur-*

*ther*, That the secretary be instructed to forthwith notify the said Franklin M. Jones that his proposition is accepted and to send him a certified copy of these resolves, and to notify him that this company is ready to receive title and conveyance of properties in his proposal specified, and to execute and deliver to him the note and agreed amount of bonds therefor."

At a stockholders' meeting, May 17, 1888, the following was adopted :

"*Resolved*, That the action of the executive committee of said company, taken on the 26th day of November, 1887, accepting the conveyance from Mr. Franklin M. Jones of the coal lands aforesaid, approving and accepting the same and authorizing the proper officers of the company to execute and deliver to the said Franklin M. Jones, trustee, a note for $5,000,000 and simultaneously with such delivery, to have endorsed upon the same, as part payment of the same $4,999,-100.00, which amount is due and unpaid upon the subscription of $4,999.100.00 of the capital stock of the company, made by D. H. Gilman, which has since been transferred and assigned to Franklin M. Jones, trustee, with the consent of the company, and upon such endorsement of credit upon the $5,000,000 note, the proper officers of the company were instructed to deliver to the said Franklin M. Jones, trustee, certificates of the paid-up capital stock of the company to the amount of $4,999,100.00, and a due bill for $320,-000.00 of the first mortgage bonds of the company, deliverable when engraved and certified, be, and the same hereby is, in all respects, ratified, approved and confirmed."

At the September, 1887, meeting the following preamble and resolutions were unanimously adopted :

"WHEREAS, This company intends to purchase a large amount of coal and other mineral lands and to open mines and develop the same and secure a large and profitable output of such mining product, which purchases and developments will make it necessary for

this company to borrow a large sum of money, which it is duly authorized to do by law; therefore be it

"*Resolved*, That to enable this company to borrow money to purchase coal and other mineral lands and to open mines thereon and develop and operate the same and to purchase cars, tools, machinery and appurtenances therefor, and to provide a working capital, the president and proper officers of this company shall prepare, seal and execute an issue of $1,000,000 of bonds, being one thousand bonds of $1,000 each, bearing date of December 1, 1887 and maturing on December 1, 1917.  Such bonds shall bear interest at the rate of five per cent. per annum, payable in New York on the first days of June and December in each year, to be evidenced by coupons attached to said bonds, which shall bear the engraved signature of the treasurer.  Such bonds shall be certified by the Manhattan Trust Company of New York, trustee, and no bond shall be valid until certified by such trustee.  To secure the payment of the principal and interest of such bonds, the president and secretary of this company shall prepare, sign, seal, execute, acknowledge and deliver to the Manhattan Trust Company of New York city a deed of trust or mortgage on all the property of this company, whether real, personal or mixed, and also all property of any kind which it may hereafter acquire in law or equity. . . . *Resolved further*, That the executive committee be and it is hereby authorized to call in the capital stock of this company at any time it may see fit to enable the company to meet its obligations."

At the same meeting the resignation of Thomas Burke as trustee was read and accepted, and T. M. Logan, of Richmond, Virginia, was appointed to fill the vacancy, and the following trustees were appointed members of the executive committee: D. H. Gilman, T. M. Logan and W. R. Thornell.

On August 27, 1889, John H. Bryant, the present receiver of the corporation, was elected president.  At

this meeting and all others the stock of the corporation was all voted together and usually by one of the local trustees at Seattle.    D. H. Gilman was the first president of the company and continued as such until the election of John H. Bryant.    Bryant continued as president and trustee of the company until the 26th of February, 1894, when he tendered his resignation as president.    He was succeeded by Mr. Maurice McMicken as trustee, Mr. McMicken being one of the firm of counsel for plaintiff, the Manhattan Trust Company.

The articles of incorporation of the Seattle Coal & Iron Company were filed February 1, 1887.    The incorporators were Henry Crawford of Chicago, D. H. Gilman, Thomas Burke and Charles M. Sheafe of Seattle, and Franklin M. Jones of New York.    The incorporators were also named in the articles as the board of trustees until May, 1887, and qualified as such.    The capital stock in these articles was named at $2,000,000, but on September 7th following, by supplemental articles filed by the same incorporators, in which it was declared that none of the capital stock had been issued or subscribed for, the amount of the capital stock was increased to $5,000,000, divided into fifty thousand shares of $100 each; and the trustees named in the original articles of incorporation were continued until the third Thursday in February, 1888. On January 4, 1888, it appears from the records that the Manhattan Trust Company was appointed registrar of the capital stock of the company.    On the 1st day of December, 1887, a first mortgage or trust deed for $1,000,000 was executed by the Seattle Coal & Iron Company to the Manhattan Trust Company of New York, the present plaintiff, as trustee, as security for a series of bonds amounting in the aggregate to the

sum of $1,000,000, each bond for the sum of $1,000, principal payable on the 1st day of December, 1917, and bearing interest at the rate of five per cent. per annum, payable semi-annually on the first days of June and December of each year, in accordance with attached coupons, both principal and interest payable at the office of the trust company in New York.

It was provided in the mortgage that each bond should pass by delivery or transfer on the books of the trustee company kept for that purpose in the city of New York, but after registration of ownership no transfer except on the books of the company should be valid unless the last transfer be to bearer; and that each bond should not be valid or obligatory unless authenticated by the execution of the certificate of the trustee endorsed thereon.   The mortgage specified the coal lands above mentioned as security therein conveyed, and also all other lands in Washington Territory which the coal company may hereafter at any time acquire or obtain an interest in, whether legal or equitable; also all easements or mining rights which it may acquire hereafter; also, all and singular, the buildings, tenements, appurtenances, shops, machinery, equipments, fixtures, chutes, scales, or other mining appurtenances, and also all personal property of whatsoever description belonging to or in any wise appertaining to the coal company then or at any time. The tenth article of the mortgage provides that the trustee " shall be under no obligation to recognize any person or persons, firm or corporation, as holder or holders, owner or owners of one or more of the bonds secured hereby, or to do or refrain from doing any act pursuant to the request or demand of any person or persons, firm or corporation, professing or claiming to be such holder or owner until such supposed holder

or holders shall produce the said bonds and deposit the same with the trustee." The mortgage further provides that any right of action under it is vested exclusively in the trustee, and under no circumstances shall any bondholder or any number of bondholders have any right to institute an action for the purpose of enforcing any remedy thereunder except in case of refusal on the part of the trustee to perform the duty imposed on it; and that all actions and proceedings taken under the mortgage shall be instituted and conducted by the trustee according to its sound discretion. It was also provided in the first article of the mortgage that if any interest on any of the bonds shall not be paid when due and shall remain in arrears for six months after demand, or if the principal shall not be paid at maturity, or in case of default for six months in the payment of whatever may be due on the sinking fund provided for in the mortgage, then it shall be the duty of the trustee, upon the request in writing of the holders of not less than one-half of the outstanding bonds, to enter forthwith and demand, take and maintain possession of all the properties secured by the mortgage *as the attorney in fact* or *agent* of the mortgagor, and to have, use, manage, operate and enjoy the said properties and every part thereof to as full an extent as the mortgagor might lawfully do, and carry on the business of mining and selling coal on the premises, making from time to time all needful repairs, alterations and additions to the machinery employed in the business, and to receive all the incoming revenue thereof, and after deducting the expenses of such use, operation, reasonable repairs, alterations and additions, and the costs and charges of taking possession, and a fair compensation for the services of the trustee for taking possession and management,

shall apply the remaining incoming revenue for the use of the mortgaged property to the payment of the interest in default from time to time and satisfy the coupons in the order of their several maturity. And it was also provided that if six months' default shall occur in the payment of either principal or interest of any of the bonds, after such actual demand, it shall be lawful for the trustee, upon the written request of the holders of a majority of the amount of the outstanding bonds, with or without entry, to cause all the mortgaged property to be sold as an entirety at public auction in the city of Seattle, after sixty days' notice, and on such sale the trustee shall execute and deliver to the purchaser a deed conveying the property so sold, which conveyance will be a perpetual bar in law and equity against the mortgagor, the coal company, its successors and assigns, and all persons claiming under it.

On the 26th day of February, 1894, the plaintiff, Manhattan Trust Company, filed a bill of complaint against the defendant, Seattle Coal & Iron Company, which, after stating the execution of the million-dollar mortgage by the defendant, and the issuance of bonds thereunder, and their negotiation, and setting forth the mortgage in full and stating that the plaintiff had duly accepted the trust and joined in the execution of the mortgage, alleged further that the defendant company had made default by failing to pay into the sinking fund and by failing to pay the interest upon the bonds issued and outstanding, due on the first of December, 1893, and that the coupons to the amount of $30,000 were unpaid. And it was further alleged that the defendant company had failed to pay its ordinary obligations incurred in the carrying on of its business operations, and that it had a present

floating indebtedness of about $135,000, which was due, and that the defendant company was totally insolvent, and that the plaintiff had been requested in writing, by the holders of more than one-half of the outstanding bonds of the issue secured by the mortgage, to enter upon, demand, take and maintain possession of the mortgaged estate and to manage, operate and enjoy the same in accordance with the provisions of the mortgage; and that under these circumstances the interference of a court of equity, for the protection of the rights of the trustee and the holders of the bonds secured by the mortgage, was important and essential, by the appointment of a receiver to take charge of and administer the affairs of the corporation, continue its business and receive and appropriate the income thereof according to the terms of the mortgage, under the instructions of the court. The prayer concludes in substance with the request that the court take possession and continue the operation of the mine indefinitely, and no application is made for foreclosure and sale. The summons issued upon this complaint was served upon the defendant on the same day it was filed and late in the afternoon, and an affidavit in support of the prayer for the appointment of a receiver was made by H. D. Williams, the treasurer of the defendant company. The company promptly appeared, but did not answer or controvert the allegations of the bill.

On the 27th of February, 1894, the court granted the prayer of the plaintiff and appointed the receiver, John H. Bryant, who had the day before resigned the position of president of the defendant company. The order appointing the receiver recites that the defendant company made no objection, but assented to the appointment of the receiver. The order directs the

receiver to immediately take possession of all the property of the defendant company, real, personal and mixed, of whatever kind and description and wherever situated, and then held by or in the possession of the company, and of all bills receivable, rents, profits and income of any of the property of the defendant company, and all franchises, rights and privileges of the defendant, and to exercise the authority and corporate franchises of the defendant company. And the receiver is further ordered to continue as heretofore the operation of the mines and business of the defendant company in the same manner as the same was heretofore carried on and operated by the defendant company, until the further order of the court. The order also commands the defendant company and all other persons to deliver to the receiver all property, papers and bills, notes and accounts under their control and in their possession; and all persons are enjoined from interfering with the possession and management of the receiver, and the company is enjoined from further prosecuting its business. It is further ordered that out of the moneys that come into the hands of the receiver from the operation of the properties of the defendant company, he shall pay, first, all current expenses incident to the creation or administration of this trust and the operation of the properties; second, the amount due all operatives, employees, attorneys and agents of the defendant company for any services heretofore rendered to the company; third, all amounts due for supplies and materials purchased and used in operating the properties of the defendant company, or due to laborers for labor performed by them in the operation of said company. And further, the receiver shall retain possession and continue to discharge the duties and trusts

until further order of the court in the premises; and he shall from time to time, not less than once every three calendar months, and at such other times as the court may order, make a report of his doings in the premises, and he shall apply to the court for such other and further directions as he may deem necessary to the due administration of the trust.

The petitioners were each creditors of the defendant coal company, and their claims had each been duly proved and certified as correct by the receiver, and no controversy is raised here as to the amount due each petitioner as claimed in the petition. These demands of the petitioners were due prior to the taking possession of the property of the defendant company by the receiver. Each petitioner applied to the receiver to have his claim assigned priority over the lien of the mortgage held by plaintiff, and upon the refusal of the receiver to allow such preference, filed his petition in court and prays that his claim may be declared prior to the lien of the mortgage, and that it be paid out of the current revenue of the properties in the possession of the receiver, if such revenues are sufficient. Otherwise, that finally it be paid out of the proceeds of the sale of the mortgaged properties before the payment of any sums due under the terms of the mortgage to the bondholders. The various petitions were consolidated, by stipulation of the parties and order of court entered thereon, into one cause. It is alleged by the petitioners that on January 8, 1894, the bondholders, who are controlling the proceedings on the part of the plaintiff were also stockholders in the defendant corporation and that they organized a committee known as a " bondholders' committee," to which committee was entrusted the entire operation and direction of the mines and mining prop-

erty of the defendant company.   The committee consists of Morton S. Peyton, Thomas Stokes and W. R. T. Jones; that the committee chose as its representative, John H. Bryant, the president of the defendant company and present receiver; that Bryant proceeded from New York to Seattle to assume personal supervision and control of the mining property on behalf of the reorganization committee; that Bryant qualified as such receiver, took into his control and possession all the property, real and personal, including about $26,000 of solvent accounts, all of which accounts he has collected; that he has, since taking possession of the said property, carried on and conducted the business as it was conducted by him as president of the defendant company, but has carried it on as the agent and representative of the bondholders and stockholders represented by the bondholders' committee; that the earnings of the receivership, including permanent improvements made upon the property, have exceeded at all times the expenditures and improvements by the sum of at least $10,000; that the plaintiff trustee for the bondholders has never moved for any default in the foreclosure suit but has allowed the defendant company to remain in default for over eighteen months prior to the filing of the petitions.

On April 9, 1896, the receiver presented his petition to the court and prayed for authority to expend $1,000 per month in improvements upon the coal mines he was operating, for the period of two years ensuing, and the court by its order conferred such authority upon him.   On the 12th of October, 1895, the court made an order directing the receiver to publish notice to creditors of the defendant corporation notifying them to present all their claims against the company, duly verified to him at his office in Seattle,

within forty days from the date of the first publication, and such publication to be made for a period of forty days. All the personal property of the defendant corporation was included in the mortgage executed in favor of the defendant trust company, which mortgage is without the affidavit required by law from the mortgagor that the instrument is executed in good faith without intent to delay or defraud creditors, and the mortgage was recorded only as a real estate mortgage. At the trial, upon the issues made between the petitioners and the receiver and plaintiff, considerable testimony was taken.

1. It is rarely, perhaps, that the purpose and effect of the commencement of a suit so fully and frankly appear as in this case and in the subsequent action of the receiver and the orders made by the court on the various requests of the receiver. Under the first article of the mortgage or trust deed the plaintiff, after the default alleged in the payment of interest due and failure to make payments into the sinking fund, was authorized to take possession of all the mortgaged property and conduct the business as the defendant corporation had done and apply the revenues to the payment of interest and making good the sinking fund. There was only $30,000 default in interest at that time. Certainly there was no objection on the part of the delinquent company to such action by the plaintiff, for it clearly appears from the whole record that the plaintiff and the coal company have been fully in accord in all the proceedings taken. But it seems from the bill of complaint that there was something like $135,000 of floating indebtedness due to unsecured creditors, and there was some apprehension on the part of the plaintiff and the defendant corporation that these unsecured creditors might press

for the payment of their claims.  In that event the personal property, at any rate, which was open to the claims of the unsecured creditors, might be seized when found either in the possession of the defendant corporation or the plaintiff.  It is, therefore, alleged in the bill of plaintiff that the interference of a court of equity was required in order to protect the plaintiff's possession of all the property of the defendant corporation under the stipulations of the mortgage, and the prayer is for such protection by a receiver.  The bill does not contemplate any change in the business theretofore conducted by the defendant corporation, but that it shall run on in the same manner under the order of the court and through the receiver appointed by the court.  The order appointing the receiver clearly shows that this was the intention of the proceeding.  Numerous and substantial improvements of the property were directed to be made out of the revenues coming in from the business, and in April, 1895, the court directs the expenditure of $1,000 per month, at the request of the receiver, for two years for permanent substantial improvements.  No intimation is given that this is a judicial foreclosure with a receiver to conserve the property and operate it until a decree and sale thereunder can be made, until more than a month after the receiver was in possession. Upon this record there can be no question but this suit and the receivership thereunder have had the effect to delay and hinder creditors, and that such delay was contemplated by the plaintiff and the defendant corporation and has been effectuated in this proceeding.  It would seem that the function of the receiver was to stand watch and ward for the plaintiff in the possession of these properties against other creditors.  But here there is much force in the con-

tention of the plaintiff and the receiver that the petitioners are estopped at this time from questioning the appointment of the receiver, and we think the authorities cited by counsel for plaintiff are in point, and this case must be tried upon the issues as framed by the petitioners and the plaintiff and receiver.

2. It is maintained by the petitioners that, under the circumstances surrounding this receivership and the operation and permanent improvement of the real property subject to the mortgage and the enhancement of its value to the plaintiff, and the use of current receipts derived from the business by the receiver for such improvements, petitioners should be assigned a preference over the plaintiff out of future current receipts or the proceeds of the mortgaged properties when ultimately sold. The plaintiff contends that the payment of such claims as the petitioners' out of current receipts has been confined by the courts to railway company receiverships, and many authorities are cited by plaintiff which fully sustain this contention. We are inclined, however, to view this case, when the action of the plaintiff and the proceedings in the court are considered, as somewhat analogous to the ordinary railway foreclosure suit. While it is true this is a private corporation and owes no such duty to the public as in the case of a railway company, yet the plaintiff and the coal company have chosen to proceed in the same manner, and the court has administered its trust after taking possession of the property in much the same way, as in the case of railway receiverships. We are inclined to question whether the plaintiff at this late date should in good conscience be allowed to raise this question.

3. There was a large quantity of personal property taken possession of by the receiver and, it appears, a

considerable portion thereof realized upon, and the funds have been used by the receiver in his management and control of the properties. There was no affidavit of the mortgagor that any mortgage of personal property was made in good faith and without any design to hinder, delay and defraud creditors, and it was not recorded as a chattel mortgage. Section 1648, Gen. Stat. (1 Hill's Code), is as follows:

"A mortgage of personal property is void as against creditors of the mortgagor or subsequent purchasers, and incumbrances of the property for value and in good faith, unless it is accompanied by the affidavit of the mortgagor that it is made in good faith, and without any design to hinder, delay or defraud creditors, and it is acknowledged and recorded in the same manner as is required by law in conveyance of real property."

Section 1649 provides:

"A mortgage of personal property must be recorded in the office of the county auditor of the county in which the mortgaged property is situated, in a book kept exclusively for that purpose."

The plain, literal meaning of these sections is against the contention of plaintiff that it has any lien whatever upon the personal property in the possession of the receiver as against these petitioners. There is no evidence whatever that the petitioners had any notice of the existence of any chattel mortgage in favor of the plaintiff. Counsel for plaintiff and receiver argued that, as petitioners, as creditors, have not negatived notice or knowledge on their part, it should be inferred against them; but this would be a novel rule and one that we have never seen applied. Such allegation and proof of notice should come from the one claiming the personal property under the alleged mortgage. But we are not prepared to decide that in any view there

could be here a chattel mortgage as against these creditors.

In *Willamette Casket Co. v. Cross Undertaking Co.*, 12 Wash. 190 (40 Pac. 729), this court held a mortgage void as to subsequent creditors, which was not recorded in a reasonable time after its execution. The court said:

"The language of the statute, and these authorities, satisfy us that it was the intention of the legislature to give no preference to a chattel mortgagee over the claims of creditors who should become such after its execution, unless it was recorded within a reasonable time after its execution." *Baxter v. Smith*, 2 Wash. T. 97 (4 Pac. 35); *Hinchman v. Point Defiance Ry. Co.*, 14 Wash. 349 (44 Pac. 867); *Mendenhall v. Kratz*, 14 Wash. 453 (44 Pac. 872); *Radebaugh v. Tacoma, etc., R. R. Co.*, 8 Wash. 570 (36 Pac. 460).

4. At the organization of the Seattle Coal & Iron Company its capital stock was fixed at $5,000,000. The law of this state requires the capital stock of a corporation to be subscribed before the corporation can do business. The subscriptions meant are *bona fide* promises on the part of each stockholder to pay the amount which he has subscribed, and the law makes him liable to creditors of the corporation for his whole subscription. The unpaid subscriptions are a trust fund for the benefit of the creditors of the corporation. The presumption is that the subscribers to the capital stock of a corporation are solvent and that the amount of the capital stock can be realized. That property may be taken by agreement between the corporation and the stockholder in payment of his subscription is the settled doctrine of this court, and does not require any further discussion here. But such a contract between the corporation and stockholder must be an honest one. It must be free from

any taint or suspicion of the avoidance on the part of the stockholder of a just payment of his subscription. In this case the stock, substantially, was taken by one subscriber. By agreement between the corporation and this subscriber, who was also president of the corporation which was afterwards formed, and confirmed later in a stockholders' meeting in which all stock was represented in the same interest, property which cost about $70,000, being undeveloped coal land, was taken in full and complete payment for about $5,000,000. No perceptible space of time had elapsed between the original purchase of this property and its transfer to the corporation. In fact, the record shows that these transactions were simultaneous. It is true that the transfer from Andrews, of the coal land, to Franklin M. Jones, trustee, was negotiated by Mr. Gilman, the original subscriber for the capital stock of the corporation, but the conveyance was immediately made to Jones, and Jones then made a proposition to the coal company of which Mr. Gilman was president and a trustee, and practically the only stockholder, to sell to the company this property, which had just been purchased for $70,000, for $5,000,000, to be paid by an issuance of the entire capital stock paid up to Jones. It is true the form of a note was gone through first, but simultaneously with the execution of the note to Mr. Jones by the corporation there was a delivery of the whole capital stock of the company, except a few shares left out to qualify trustees, and a credit immediately indorsed upon the note substantially paying it. But further, at the same time, Mr. Jones, as trustee, evidently thought that some money would be required to develop this coal land, and in the advancement of any money he desired to have it well secured. Evidently here there was no intention that the stock-

holders should pay any money, and Mr. Jones, as the stockholder, endeavored to protect himself, or rather himself and associates for whom he was trustee, by requiring an additional consideration for the coal land, which had cost about $70,000, of $320,000 in first mortgage bonds, upon which he doubtless deemed that he and his associates could safely advance some money. Thus Mr. Jones took all the stock of the company and then, for any money that he might advance in the enterprise and to avoid any danger of loss in the speculation after taking the coal land, proceeded to take a bond to make " assurance doubly sure."

Cook on Stock and Stockholders (vol. 1, § 47), states the following rule :

" The questions as to whether there was an overvaluation of the property, and whether that overvaluation was intentional and fraudulent, are generally questions of fact to be submitted to the jury. Where, however, the overvaluation is so great as to bear evidence upon its face that it was intentional and fraudulent, the court will hold that, unless the transaction is reasonably explained, there is no question of fact for the jury, but that, as a matter of law, the overvaluation was fraudulent."

This principle has been frequently applied. *Douglass v. Ireland*, 73 N. Y. 100; *Boynton v. Andrews*, 63 N. Y. 93; *Osgood v. King*, 42 Iowa, 478; *Elyton Land Co. v. Birmingham Warehouse Co.*, 92 Ala. 407 (9 South. 129, 25 Am. St. Rep. 65).

In the trial of this cause the plaintiff trustee has not offered any explanation of the very apparent overvaluation of the property conveyed by the subscriber to the capital stock in payment of his subscription. In the case of *Turner v. Bailey*, 12 Wash. 634 (42 Pac. 115), there was alleged overvaluation of the property conveyed by stockholders in payment of their sub-

scriptions to the capital stock of a corporation, but in that case evidence was offered by the stockholders, which was satisfactory to the court, in explanation of the good faith of the transaction. We do not think that such a glaring discrepancy between the apparent value of the property conveyed and the amount received for it in payment for the capital stock as appears in the case at bar can be sustained.

5. The petitioners offered testimony tending to show that the conditions existing at the time of the organization of the defendant corporation had continued and that the issue of at any rate $320,000 in bonds to the stockholders at the organization had not passed from the original owners of such bonds. We think the testimony fairly sustained the contention of the petitioners. It was easily within the power of the plaintiff trust company to have shown the real facts as to the present ownership of these bonds. It was and is the registrar of both the stock and bonds. By a stipulation in the mortgage it was entitled to have placed in its possession all the bonds which it represented. At the trial the stock book was called for by petitioners, and we do not think any satisfactory explanation was offered by plaintiff and receiver for its absence. The responsibility for its possession seemed to be shuffled about among the various officers of the defendant corporation. And it may be further noted that the inventory filed by the receiver on the 27th of March, 1894, of the furniture and books of the defendant corporation in his possession, shows that at that time the stock book was there.

Under the circumstances of this case the identity of a substantial portion of the bondholders with the original stockholders of the company being determined, the conclusion is inevitable that in equity and good

conscience the lien of the mortgage should be postponed in favor of the petitioners here.

It is not necessary that absolute bad faith should appear to constitute fraud in law.

" Where a fraud has been proven the party whose title is derived through such a transaction must prove his own good faith and want of notice." 16 Am. & Eng. Enc. Law, 842; *Stutz v. Handley*, 41 Fed. 531; *Richardson's Executor v. Green*, 133 U. S. 30 (10 Sup. Ct. 280).

In this case no question has been raised or considered as to the whole property of this corporation being a trust fund now in the possession of the court for the benefit of the creditors of the corporation alike, but it is heard and determined upon the issues presented in the pleadings.

The order and decree of the superior court is reversed and the cause remanded with instructions to that court to adjudge the claims presented by the respective petitioners superior to the lien of the mortgage of the plaintiff, and that such claims be paid out of any surplus arising from the revenues of the properties of the defendant corporation, after the payment of the necessary running expenses and for the conservation of the properties now in the possession of the receiver; and that if such funds be not sufficient to pay the claims of the petitioners, such claims be paid out of the proceeds of the sale of all the properties now in the possession of the receiver.

SCOTT, C. J., and DUNBAR, ANDERS and GORDON, JJ., concur.

### OPINION ON PETITION FOR RE-HEARING.

REAVIS, J.—On review of this cause, on the petition for re-hearing of plaintiff and receiver, we are content with the decision announced. In those con-

clusions the issues as presented in the pleadings filed in the superior court were alone considered. The issues of fact raised there were joined by both parties. A trial was had and testimony heard by the court. Findings of fact and conclusions of law were made and judgment was entered. The rights of the respective parties were finally concluded by the judgment. The technical accuracy of the pleadings was not questioned in the court below, and was not seriously questioned upon argument here, though much attention is given to them in the able argument for a re-hearing filed by the plaintiff and receiver.

It is maintained with much force by the learned counsel for plaintiff and receiver, in the petition, that the opinion rendered in the cause places the mortgage or trust deed of plaintiff subordinate and inferior to the claim of any general creditor against the defendant corporation, Seattle Coal and Iron Company. It was stated before that the cause "is heard and determined upon the issues presented in the pleadings," which apparently ought to confine the decision to the parties before the court. It was also found that, as between the parties at trial, the testimony adduced by petitioners raised the presumption that the bondholders represented by the plaintiff were substantially identical with the original stockholders, and, *arguendo*, mention was made that the plaintiff was registrar of the stock and bonds and that the receiver had formerly shown to the court where the stock book was and that it was in his possession; that the plaintiff did not rebut, although within its power, the presumption raised by the testimony of the petitioners of the substantial identity of the bondholders and stockholders, and that the receiver did not satisfactorily explain why the stock book was not produced at the

trial.   No issue was presented here between the general creditors, other than petitioners, if any, of the Seattle Coal & Iron Company and the plaintiff and receiver, and none is now determined by this court.

Scott, C. J., and Anders and Dunbar, JJ., concur.