[No. 2939.  Decided June 18, 1898.]

MANHATTAN TRUST COMPANY, OF NEW YORK, *Appel-lant*, v. SEATTLE COAL AND IRON COMPANY, *Defend-ant*, MURPHY, GRANT & CO. *et al.*, *Respondents*.

CORPORATIONS — CAPITALIZATION — FRAUD — MORTGAGES — SALE AS ENTIRETY — CONCLUSIVENESS OF DECREE — PARTIES — PRIORITY OF CLAIMS — RECEIVERS.

The capitalization of a coal mining company at $5,000,000 is not shown to be fraudulent by the fact that the property of such corporation consisted of coal lands purchased by the promoters of the corporation for a sum less than $100,000, where the grant-ors did not know the full value of the land and some sold for less than they believed it worth for the purpose of developing that section of the country, and estimates obtained by the pro-moters showed that there were more than 10,000,000 tons of coal in the land, which could be put on the market at a profit or from one to two dollars per ton.

The fact that the holder of a mortgage covering both real and personal property undertakes to enforce the claim under the mortgage, though the mortgage on the personalty is invalid, is not sufficient to establish fraud on the part of the mortgagee.

A mortgage executed by a company while it was solvent is not fraudulent as to general creditors, where there was no fraud in the original incorporation of the company, and the stock was all issued as fully paid up, the mortgage duly recorded, and the debts of such general creditors incurred long afterwards.

A judgment giving priority to the claims of certain general creditors of a corporation over the holders of bonds secured by a trust deed executed by such corporation, rendered in an action to foreclose such deed brought by the trustee therein, is conclusive on all the bond-holders, where the trust deed provided that such trustee should be trustee for all the bond-holders and have the exclusive right to bring suit on the request of a majority, and that no bond-holder should be entitled to sue without having first requested the trustee to sue.

The general creditors of a corporation cannot complain that a decree in an action to foreclose a trust deed executed by the corporation, in which all the creditors were made parties, provided for the sale as an entirety of all the property of the corporation, including personalty not covered by the trust deed, where no request for a separate sale of the personalty was made, and no appeal taken on that point by the party objecting.

General creditors of a corporation whose claims have been adjudged prior to the claims of holders of bonds secured by a trust deed do not relinquish their priority as against the bond-holders by inviting certain other creditors to come in and participate on paying them a percentage, where there was no intention to relinquish their priority and their claims would have been paid in full, even if such other creditors had been allowed to participate.

A proceeding for the appointment of a receiver for a coal and iron company, which operated a short railroad line in connection with its mines, should not be treated as a railroad receivership so as to give precedence to claims for supplies furnished in the conduct of the business a few months prior to the receiver's appointment, as the essential element of a railroad receivership—the maintenance of the operation of the road for the benefit of the public—is lacking.

Appeal from Superior Court, King County.—Hon. WILLIAM HICKMAN MOORE, Judge. Reversed.

*Struve, Allen, Hughes & McMicken, Condon & Wright,* and *S. H. Piles,* for appellant.

*Bausman, Kelleher & Emory, Strudwick & Peters, Donworth & Howe, Preston, Carr & Gilman,* and *Burke, Shepard & McGilvra,* for respondents.

The opinion of the court was delivered by

Scott, C. J.—This is the same plaintiff that was before this court in the case reported in 16 Wash. 499 (48 Pac. 333, 737), and the relator in the application for a writ of prohibition reported in 17 Wash. 380 (49 Pac. 507), and the appeals herein relate to the same proceedings.

While said former appeal, which was taken by certain creditors from an order dismissing their petitions, was pending in this court the plaintiff, on December 29, 1896, procured a decree of foreclosure of its mortgage in the lower court. An order of sale was issued thereon and the property struck off to the plaintiff, but, before a confirmation was had, the remittitur was sent down from this court and the lower court rendered another decree on June 4, 1897, setting aside the sale and its judgment of dismissal as against the appealing creditors, and modified the foreclosure decree by establishing a priority in their favor as against the bonded indebtedness, and also made provision to the end that other creditors might be enabled to show a preference right. For convenient reference the creditors, aside from the bondholders, were classified substantially as follows:

Class " A "—The five original petitioners who had appealed to this court. 16 Wash. 499, *supra.*

Class " B "—Those other creditors who had presented claims to the receiver pursuant to his published notice under the court's order, which were reported by him as allowed subject to the superior lien of the plaintiff's mortgage, but who did not appeal and who were referred to in the decree of June 4th.

Class " C "—The Manhattan Trust Company in its own right and J. D. Smith & Company, who did not present their claims to the receiver until May, 1897, after the time

fixed by the order aforesaid, but were in prior to the decree of June 4th.

Class 'D "—The Seventh National Bank of America, The Bank of America, Alexander M. White and J. F. Alexander, who did not present their claims until after the order and decree of June 4. In its last decree of February 23, 1898, the court provided that all the creditors in Class "B" and some of those in the remaining classes should take precedence over the bonded indebtedness and established certain preferences among the various creditors as against each other, some being admitted to share *pro rata* with class "A."

The principal appeal was taken by the plaintiff contending in part that the decree of foreclosure rendered on December 29, 1896, was final as to all creditors except those in Class "A" who had previously appealed and that by it the bonded indebtedness under the mortgage was given preference as to all except the five creditors in Class "A" aforesaid, and contending further, in case the mortgage should be set aside, that all of the bondholders are entitled to come in as general creditors, and share equally in the distribution of the funds. Appeals are presented, also, by some of the general creditors, which for convenience have been designated as cross-appeals, and raise questions as to the preferences decreed. In rendering the last decree the lower court was of the opinion that the matters had been determined on the former appeal but admitted all the proofs of the respective parties to the end that the controversies might be finally disposed of, and it is here practically for a trial *de novo*. In consequence of the voluminous record and the numerous conflicting claims presented, the case is a most complicated one, but it will not be necessary to set forth all of the contentions in detail, owing to the conclusion we have reached with reference to the mortgage.

A much stronger showing has been presented by the plaintiff than was made at the time the other appeal was heard, and it may be well at first to consider the matter as if this were the first hearing in this court, although it will not be necessary to give as full a statement as it would have been were it not for the previous hearing, the facts largely appearing in the former opinion, certain of which will be referred to later. But briefly, the Seattle Coal and Iron Company was organized as a corporation under the laws of the territory of Washington about the first of February, 1887, for the purpose of purchasing, improving, developing and mining coal lands and selling the same, with a capital stock of $2,000,000, which was afterwards, by supplemental articles filed September 8, 1887, increased to $5,000,000. The entire capital stock, in shares of $100 each, was subscribed September 30, 1887, and was shortly thereafter issued in regular form as fully paid stock. In carrying out its corporate objects the corporation acquired about 1,340 acres of coal land, near Gilman, in King county, in the month of October, 1887, and developed and operated the same on an extensive scale continuously from the time of purchase until the appointment of a receiver, February 27, 1894. The land was purchased of various parties for something less than $100,000 in the aggregate, and it is contended by the appealing creditors that it did not exceed that amount in value, and one ground of fraud urged on the former hearing, to which considerable weight was attached by the court, was that the capitalization was fictitious and fraudulent.

The plaintiff contends that under the decision of this court in *Kroenert v. Johnston, ante,* p. 96 (52 Pac. 605), the company had a right to place its own valuation upon its property, and that under the statute, § 4280, Bal. Code (1 Hill's Code, § 1588) the entire capital stock might be

represented by the mining property. There may be some question as to whether a coal mining company is within the terms of this statute, or whether it was not intended to apply only to corporations organized for mining precious metals, where the undertaking is more hazardous and speculative, the chances of success less and the possibilities greater. There the statute provides in substance that the entire capital stock may be represented by the property or mining claims and that there need be no subscription. The constitutionality of the subscription provision of the statute, under article 12, with reference to corporations other than municipal, was not in question there, it not being a mining company, nor here, for in this case there was a subscription to the stock. Also this company was organized before the constitution was adopted and the matter is only incidentally referred to. But there might not be much real difference in any event except, perhaps, as to the valuation of the property, under the rule which is too firmly established in this state to be called into question now, and in fact is not questioned, that property may be taken in payment of shares of stock of corporations generally. As to this question, and the rights and liabilities flowing therefrom in fixing the valuation, the authorities have been considered by this court to some extent in the case cited, and in *Turner v. Bailey*, 12 Wash. 634 (42 Pac. 115), there referred to, and it is not necessary to consider them further.

This land, when purchased, was in an undeveloped state; and testimony was introduced with reference to its estimated or prospective value in substance as follows: One Gilman testified that

" I was the original promoter [of the Seattle, Lake Shore & Eastern Railway]. My attention was first called to Seattle by a description being sent to me of this particular coal field, and I went there from New York for the express

purpose of looking into this coal field. After I had, in company with a skilled coal mining engineer, examined the property, I came to the conclusion that it would require about twelve to fourteen hundred acres to control the field and make a successful operation, and I therefore, from that time, about 1883, set about negotiating options on about that number of acres owned by various parties. Nothing had been done toward the development of these lands except the sinking of a few pits. In connection with that I had to consider the question of transportation to tide water; in a direct line, 25 miles; by the only practical route, 40 miles. I then organized the Seattle, Lake Shore & Eastern Railroad Company, and secured terminals at tide water at Seattle, had partial surveys of the route made, and came to New York for the purpose of raising the money necessary to build this 40 miles connecting the coal field with tide water at Seattle. I was successful in that by reason of the valuable terminals at tide water that I had an option on and the control by option of this coal field, which by reason of the state of the coal trade there would show an enormous profit in the operation of such a railroad. . . .

At the time I secured the options I knew pretty well what the extent of the coal field was. The owners did not. Before, the property was in several ownerships, and the individual owners were never able to develop it, nor could they do anything toward the construction of the railroad to tide water. In my opinion, uniting all of the properties into one ownership and the building of the railroad enhanced the value of the properties.

I was one of the parties organizing the Seattle Coal and Iron Company, and had a share in fixing the capitalization of that company. It was based on what I conceived to be the earning capacity of the property after the railroad was constructed to it. I had studied the history of the coal business on the Pacific coast two or three years prior to that time, and ascertained the various sources of supply, foreign and domestic, the number of tons that came from Puget Sound, the cost of mining and transportation, and that investigation showed that the profits prior to that

time on coal had not been less than $1 per ton, and was generally from $1.50 to $2 per ton. That was net. I ascertained to my satisfaction (the quantity of coal) and I think I so stated in the railroad company's prospectus that we could mine 1,000 tons per day from that property, and would not exhaust it in 100 years, and I think I further stated that our minimum output for our first year would be 1,000 tons and possibly 1,500 to 2,000 tons per day. Our capitalization was based upon our belief in these facts, that is, that the minimum profit would be $1 per ton net, and if we mined 1,000 tons per day for 300 days would be 300,000 tons per year, giving us a revenue of $1,000 per day, which would yield, not only 5 per cent. on the bond issue of $1,000,000, but 5 per cent. on the $5,000,000 of the capitalization, and that there was a large amount of bonds in the treasury to be used for development of the mine, building the bunkers, and as I expected at that time to put on a fleet of four-masted schooners to carry coal to San Francisco; and there would be a revenue of fifty to one hundred thousand dollars from those sources, which would really make this stock a 6 per cent. stock. The Seattle Coal and Iron Company issued $5,000,000 of stock, but $2,000,000 was covered into the treasury to be used as treasury stock, so that its outstanding capital was $3,000,000, the same as that of the Seattle Coal and Transportation Company, in which the title of the New Castle mines was, and which is owned by the Oregon Improvement Company. That property is nothing like as valuable as the Seattle Coal and Iron Company in my judgment."

Mr. Gilman says he assigned the options to Jones, who paid cash for the lands and turned them into the company with the capitalization, and that the promoters placed a certain amount of stock with Jones and the syndicate that took bonds as an additional consideration for the bond purchase. There was testimony by at least one other witness to the same effect as to the values of the property, and as an expert having a special knowledge of the subject.

It was also controverted to some extent by witnesses showing the prices paid and their estimate of the value of the land purchased. One of the grantors testified, however, that an important consideration in inducing him to sell, in addition to the price paid, was the opening up and developing of that section of the country, as he had other real estate in that vicinity.

According to these estimates by the promoters, more than ten million tons of coal existed in these lands above water level. The cost of mining and transporting the same could be fairly well estimated. The scope of the demand and net value of the product in the market were measurably known. It does not appear that the vendors knew of the existence of the coal, or could procure the means to develop the mines if they did know it. No accurate money valuation could well be placed upon these lands, under the circumstances. As the plaintiff argues, to say that the ascertainment of the quantity and quality of the coal, the consolidation and ownership of the land, the securing of money for the development and the prosecution of the enterprise, did not largely enhance the valuation of the property in the estimate of those acquiring it, would be unwarranted. There is no showing now that the quantity or quality of the coal was not as estimated, or that the estimate was insincere. In fact, it fairly appears that the failure of the enterprise was due to the financial and business conditions existing for some time, but commencing several years thereafter. No inference of bad faith should be drawn from the fact that the projectors could not forecast this.

It has been urged that the fact that some two million dollars of the stock was turned back into the corporation, to be disposed of to assist in raising funds for the prosecution of the enterprise, and was sold, with the bonds,

for considerably less than its par value, goes to show that the projectors knew that the estimate was extravagant and fraudulent; but we do not think this in anywise tends to establish fraud, as against these creditors. It was: necessary to raise money for the development of the enterprise, and no doubt can exist that it was then thought it would be profitable, to a large extent, on that basis. It is also urged that there was proof to show that the corporation was the real purchaser in the first instance, and that payment for the land originally was in some instances,. at least, made by the corporation. But this, if true, could lend no additional significance on the question of fraud, as against the parties now complaining, in connection with the other facts shown.

The plaintiff also produced upon the trial, so far as it was able, the stock books, transfer books and corporate records of the Seattle Coal and Iron Company, and proved that it did not have or control certain records of said company.

Without going more fully into the testimony it is sufficient to say that it establishes, in the opinion of the majority of the court, entire good faith on the part of the promoters and the corporation in the matter of the capitalization, and we are compelled to find at this time, regardless of whether we were right or wrong before, that there was no fraud shown, even though it was conceded that the value of the land was exaggerated in the capitalization of the company. If there was any fraud contemplated, what was it? One would naturally look for some system or scheme to defraud, if fraud was intended at its. inception. The fact of an exaggerated value might have an important bearing under certain conditions; for instance, if the bondholders were here complaining that they had been deceived by an excessive valuation placed

upon the property and had been led thereby into buying the bonds on the belief that they were amply secured, then the question would be brought directly in issue, for there was an intention to float the bonds of the company and many of them were disposed of to various parties, not all of them stockholders. But it is sufficient to say that no bondholder is complaining of any fraud. The claims of the general creditors were for supplies sold to the company and for money loaned to it, all of which were used in the conduct of its business. At most, there is no showing or contention that any of the proceeds were fraudulently issued to the stockholders, in dividends or otherwise, and it appears without controversy that for a long time the company prosecuted its business successfully. These debts were all incurred some years after the formation of the company, the execution and recording of the mortgage and the issuance of the bonds.

It is no longer a question as to whether the former decision of this court was right or not, but only as to how far it is binding and conclusive. The suit was brought originally to foreclose the mortgage and it was not an insolvency proceeding, although the general creditors were invited or notified to present their claims. It, however, has become substantially an insolvency proceeding, the parties all being before the court, although the receiver did not represent the general creditors, at least originally. But the case presented is very different from one where a mortgage is given by a corporation after its insolvency, with reference to the distribution of its funds among its creditors.

The decree rendered in the lower court pending the appeal did not establish the validity of the mortgage as against the other creditors, because it was not final, under our previous holdings. See opinion on rehearing, 16

Wash. 522 and on application for writ of prohibition, 17
Wash. 383.   By these opinions the proceeding was not
finally adjudicated, but was left in a condition for creditors
other than those in class " A " to contest the validity of
the mortgage bonds, and they were given an opportunity
of making a showing entitling them to precedence there-
over if they could do so.   But it left an issue to be tried
as to them, and each creditor's claim could only rest upon
its own basis, as facts might possibly exist which would
make the mortgage void as to some and valid as to others,
it not having been given while the corporation was insol-
vent, as stated, and therefore not void as to the creditors
generally.   No such facts, however, with reference to any
of them have been shown.   None of them are entitled to
come in under the former decree with the five appealing
ones and have it treated as conclusive as to settling their
rights, for they did not appeal;   and this court expressly
stated in the opinion that it only determined the issues
with reference to the pleadings and the parties then before
the court.   The plaintiff's case now stands upon a dif-
ferent and much stronger footing with regard to them,
as stated, no fraud being shown in the original incorpora-
tion and the subsequent increase of its capital.   There was
no subscription liability, the stock having been issued as
fully paid up, nor is there any attempt to enforce any
such liability.   Neither was any fraud shown in conduct-
ing the business, but the same was evidently carried on in
good faith in pursuance of the objects for which the com-
pany was formed.   The mortgage was duly recorded, and
the debts to them were incurred long afterwards.   Of
course, if there had been a subscription for the shares of
stock, which was only partially paid, there would have
been a contract liability against the subscribers, which
the creditors could enforce;   but inquiry would have

shown that the stock was issued as fully paid up, and that the property of the company was subject to this mortgage to secure its bonds, aggregating a large amount. Neither do we find that there was any fraud in the bringing and conduct of the suit to foreclose the mortgage. These and all other creditors were notified to come in and present their claims. Many of them did so without much delay and, if they were not satisfied with the way the suit was being conducted, and the management of the property by the receiver, they had the right to apply to the court for an immediate sale, or for such relief as they considered themselves entitled to. The proceeding was an open one in the courts of the state in the locality where many of the creditors were doing business, and there was no possibility, much less an attempt, at concealment. It is a well established principle that fraud is never presumed, but must be satisfactorily proven. This rule applies to corporations as well as to men in their individual capacities. Although the plaintiff claimed a mortgage on the personality which was found to be invalid, it did not establish any fraud on its part in undertaking to enforce the claim under the mortgage. Knowing all the facts, or being bound to know them, these parties could not become creditors and then attack the transaction. If they were knowing and willing victims, they had no ground of complaint.

As to the rights of the creditors in class "A" as against the bondholders, the mortgage being sustained, we may not fully understand the plaintiff's contentions, owing to the complicated arguments presented, rendered necessary to meet the various phases the case might assume as the court might find with reference to the numerous questions raised. It is urged in case the mortgage lien should be set aside that all the holders of bonds should be

entitled to come in and share equally with these creditors. But that was settled adversely as to all of them, if they were all parties. See last two paragraphs opinion, 16 Wash. 522 (48 Pac. 737). While it was recited that the mortgage lien as to these creditors was set aside, or that they were entitled to a preference over the mortgage, a further direction was made, to the end that they be paid before the mortgage claims were paid, and this would follow from the theory upon which the case was disposed of at that time; for the mortgage was adjudged fraudulent in consequence of its having been given to secure what were then thought to be fraudulent claims, and on the ground that the stockholders and bondholders were identical. There were three different grounds upon which fraud might have been based; one, a fraudulent scheme in the formation of the company; another, although there was no fraud at that time, a fraudulent conduct and management of its business affairs later; and third, a fraudulent bringing·of the suit for the purpose of preventing the general creditors from realizing anything. Importance was attached to the first and last grounds in rendering the opinion at that time, and the five appealing creditors are entitled to the benefit of it now, whether it was well based or not; and it would entitle them to priority over the claims of the bondholders, regardless of the mortgage, if they can be held as parties to the suit. We are not certain it is contended now by the plaintiff that the opinion heretofore rendered, and decree thereunder, were void as to any of the bondholders in consequence of their not having been before the court. But, as to this, it appears that nearly all of them were parties to the reorganization scheme in pursuance of which the foreclosure action was commenced; some were holders of stock, and some bought bonds after the suit was begun. There were

instances, however, where the bonds were evidently bought in good faith by parties who did not hold stock; but the mortgage provided that the plaintiff should be trustee for all the bondholders and have the exclusive right to bring suit upon the request of a majority; that no bondholder should be entitled to sue without first having made a request to the plaintiff to bring suit, and upon its refusal to do so. The bonds were similar in form, and it appeared upon the face of each that it was one of a large number secured by this mortgage and that the plaintiff was trustee for all of the holders; so each one had notice. And we are of the opinion that they were all parties, even if considered as general creditors, aside from the security, and bound accordingly, and that none of them would be entitled to a *pro rata* share of the proceeds with said five creditors, whether the mortgage be sustained or not.

A further claim was made by the appellant to the effect that these creditors in class " A " abandoned their right to priority in consequence of their having invited or assisted certain other creditors, viz., those in class " B," to come in and participate on paying them a percentage; but it appears that there was no intention on the part of these creditors in class " A " to relinquish their priority as against the plaintiff, and their claims would have been paid in full, even if those in class " B " were allowed to participate. We do not think they should be held estopped thereby.

There was a contention also by one of the respondents to the effect that there was a large amount of personal property not covered by the mortgage, the proceeds of which should be held for distribution among the creditors generally. As against this, it has been urged that there was no request for a separate sale of the personalty and that the decree provided for the sale of the property, both real and personal, as an entirety, which had not been appealed

from by the party raising the question. We think this is a sufficient answer to this contention. It probably is not very important, in consequence of the large number of creditors, including the bondholders, who would be entitled to participate in it and of the very small *pro rata* amount that would go to the general creditors, if it were separately distributed.

There was a further contention that this is a proceeding *in rem* and that all parties and creditors were bound by the proceedings and decision. The binding effects of the prior decision have been sufficiently discussed, and it is unnecessary to enlarge upon it. The contention now would be practically fruitless to those urging it, the mortgage being held valid as against them, and it being conceded that there is not enough property to pay the creditors in class " A " and the holders of the bonds, who would be entitled to a prior payment, as against these other parties, even though it were a proceeding *in rem*.

It has also been urged by the creditors in class " B " that this proceeding should be held similar to a railroad receivership, to the end that certain of their claims, which were for supplies used in the conduct of the business of the company and furnished within a few months prior to the appointment of the receiver, should be given precedence. This matter was noticed incidentally in the former opinion (16 Wash. 516;   48 Pac. 337), but was not expressly decided, although it was said that the plaintiff's contention that the payment of such claims out of current receipts was confined by the courts to railway receiverships, was amply sustained by many authorities;   but it was intimated, under the facts then appearing, that the plaintiff might not be allowed to raise the question;   but there was nothing conclusive in this, in any event, as against these parties now questioning it, and we are of the

opinion that the contention should not be sustained, because this receivership lacked the essential element of a railroad receivership, viz., that of maintaining the operation of the road for the benefit of the public, and we find nothing in the proceedings sufficient to estop the plaintiff from resisting such payment. The claim of the plaintiff in its own right is not urged against the holders of the bonds, and the effect of the former decisions of this court in the matter was to subordinate it to class " A " creditors. We hold that the creditors in class " A " are entitled to payment before anything is paid to any of the bondholders, and that the bondholders are next entitled to payment. It being conceded that there is or will not be enough to pay them, it is not necessary to pass upon the questions of priority between the remaining creditors.

Reversed, to be remanded accordingly.

Owing to the complicated and conflicting rights urged on these several appeals a period of thirty days will be allowed after the time for filing petitions for a rehearing has expired and after such as may be filed, if any, are disposed of, to the respective parties to make a written claim or showing as to which ones and against which ones costs of these appeals should be allowed, with the items claimed.

ANDERS and GORDON, JJ., concur.

DUNBAR, J. (dissenting).—I dissent. My understanding of the disposition of this case when it was before this court at its January term in 1897 was that this mortgage was held void as to the creditors who then appeared and to all others who stood in the same position as the creditors appealing. This is not exactly the language of the opinion, but it was my understanding of the opinion, and I think can be fairly gathered from the language used. These creditors in class " B " presented their claims under

the orders of the court after the case was remanded and upon application for a writ of prohibition this court decided that the court below was proceeding in an orderly manner to settle the claims, and it seems to me did settle them in accordance with the equities existing. But conceding that the prior judgment of this court only affected the standing of this mortgage in its relation to the five appealing creditors, I am of the same opinion now in relation to the merits of the controversy as I was when the case was here before. The appellants rely upon the decision of this court in *Kroenert v. Johnston, ante,* p. 96 (52 Pac. 605). I did not subscribe to the doctrine announced in that decision and never can as long as the laws in relation to the government of corporations exist as they do now. But this case, it seems to me, goes even beyond *Kroenert v. Johnston, supra.* It has been established by this court in common with most of the other courts of the Union that stock in corporations could be paid for in money or money's worth. Even this was a modification of the law and a concession in the interest of the corporation; but it was a harmless concession, for the term "money's worth" is well understood and not susceptible of two constructions. It means, of course, property worth the money, and not worth one-half or one-tenth of the money. Under this rule the real relations of the corporation with the creditors are not changed; for the corporation still has in its possession for the benefit of the creditors the full value announced. But it has never been a recognized rule in any court that I know of that corporations in their dealing with private individuals would be protected in a fraudulent estimate of their capital stock. I am aware that it is hard to realize the values that were honestly placed upon property of all kinds during the inflated period commonly called "boom times," and that it

makes a wonderful difference whether we are looking through the small or large end of the telescope, but the action of the corporation in this respect convinces me that it was the intention of the corporation to place a value upon its property which it knew did not in reality exist, for the purpose of obtaining credit and of selling its bonds. The majority says:

"It has been urged that the fact that some two million dollars of the stock was turned back into the corporation to be disposed of to assist in raising funds for the prosecution of the enterprise and was sold with the bonds for considerably less than its par value, goes to show that the projectors knew that the estimate was extravagant and fraudulent, but we do not think this in anywise tends to establish fraud as against these creditors."

The opinion further states that

"The fact of an exaggerated value might have an important bearing under certain conditions; for instance, if the bondholders were here complaining that they had been deceived by an excessive valuation placed upon the property and had been led thereby into buying the bonds on the belief that they were amply secured, then the question would be brought directly in issue, for there was an intention to float the bonds of the company and many of them were disposed of to various parties, not all of them stockholders. But it is sufficient to say that no bondholder is complaining of any fraud."  .

I cannot understand under what theory of law or ethics the fraud would be any more vicious or violent, if by reason of this exaggerated value bonds were sold to innocent purchasers, than it would be, if by reason of an exaggerated value, credit was obtained and goods secured which could only be obtained and secured by reason of the fraudulent holding out of the value of the property of the corporation. All the laws compelling these valuations and prescribing the actions of corporations in cases of this kind are for

the purpose of giving notice to the public and of protecting parties who deal with the corporations. It seems to me that these laws might as well be swept from the statute books, if·it is to be coolly held that no fraud as against creditors can be predicated upon the action of a corporation in estimating and holding the value of its property at ten or twenty or a hundred times its actual value. Relying upon the expressed valuation of the property of the corporation one might readily loan a hundred thousand dollars to a corporation that, according to its showing and its representations solemnly made, had property worth five million dollars when he would not be willing to credit it for more than one-tenth that amount if its property was known to be of the value of $100,000. There is no hardship imposed upon a corporation by compelling it to deal honestly, openly and above board with the public. In this instance, I think it is clear that the dealing has been exactly of the opposite character, that these creditors were deceived, that in effect a conspiracy has been entered into for the purpose of depriving them of their proportionate share of the proceeds of the estate of this corporation. In my judgment the findings of the lower court were right and should be sustained.

REAVIS, J. (dissenting).—I am constrained to dissent from the opinion of the majority of the court, and more particularly from the process of reasoning upon which the decision is based. That property may be taken by a corporation upon its organization in payment of the capital stock subscribed by a stockholder has been announced by this court heretofore and is the rule uniformly followed here. The payment of the capital stock must be made in good faith by the stockholder. So long as there are honest differences in the estimate of the market value of the property so taken in payment for stock, the valuation made

by the corporation and the stockholder should be a question of fact. I think the true rule is well stated by this court in *Adamant Manufacturing Co. v. Wallace*, 16 Wash. 614. This was the judgment of the whole court at that time, and it was there observed:

"It must necessarily follow, for the protection of creditors who dealt with these corporations, that the stock subscribed for must be paid in cash or in property of an equivalent value. In other words, the corporation must be in the actual condition which it represents itself to be in financially. If it were allowed to hold itself out as having a capital stock of $100,000, when in reality the capital stock, which is and must be, under the theory of the law, assets in the hands of the corporation, is worth only one-half that amount, the corporation is to that extent doing business under false colors, and is obtaining credit upon the faith of an asserted estate which is purely fictitious. And where, by any arrangement between the shareholders and the corporation, the stock is issued as fully paid up, when in fact it has not been paid to the full amount of its face value, but has been paid in property of a fictitious or inflated value, a court of equity will compel a payment by the stockholder for the benefit of the creditor who has dealt with the corporation relying upon the asserted value of its assets to the full amount or face value of the stock. Such is almost the universal holding of the courts of the present day."

The statute, §4266, 1 Bal. Code (1 Hill's Code, §1511) declares:

"Each and every stockholder shall be personally liable to the creditors of the company, to the amount of what remains unpaid upon his subscription of the capital stock."

Section 4269, 1 Bal. Code (1 Hill's Code, § 1513) provides:

"It shall be the duty of the trustees of every company incorporated under this chapter to keep a book contain-

ing the names of all persons, alphabetically arranged, who are or shall be stockholders of the corporation, and showing the number of shares of stock held by them respectively, and the time when they became the owners of such shares, which book . . . shall be open for the inspection of stockholders and creditors of the company . . . and such book . . . shall be presumptive evidence of the fact therein stated in any action or proceeding against the company."

Section 4265, 1 Bal. Code (1 Hill's Code, § 1510) provides:

"It shall not be lawful for the trustees to . . . divide, withdraw, or in any way pay to the stockholders, or any of them, any part of the capital stock of the company, unless in the manner prescribed in this chapter. . . . Provided, that this section shall not be construed to prevent a division and distribution of the capital stock of the company, which shall remain after the payment of all its debts upon the dissolution of the corporation or the expiration of its charter."

I think it apparent that the legislature has thus, as it might rightfully do in the formation of corporations, provided for the full payment of the capital stock of the corporation in money (but the courts have gone a step further and sanctioned a payment in money's worth); that the capital stock, if remaining unpaid, is always a trust fund for the creditors; and it would be trite to recall the presumption that the subscribers to the capital stock are deemed solvent, and that the fund thus created is really in existence.

The case of *Kroenert v. Johnston, ante,* p. 96 (52 Pac. 605) decided after that of *Adamant Mnfg. Co. v. Wallace, supra,* was by a divided court, Judge DUNBAR dissenting and the writer concurring in the result. I do not, however, think the reasoning in that case is the law, or in consonance with the better authority. I believe the rule

expressed in *Adamant Mnfg. Co. v. Wallace, supra,* that, so far as creditors are concerned, subscriptions to the capital stock of the corporation must be fully paid for in cash or in property of an equivalent value, irrespective of any understanding shareholders may have among themselves as to the payment of stock or as to its value, is the true rule, and but a fair interpretation of the statutes of the state. It would seem vain legislation to subject stockholders to a personal liability to creditors for the full amount of their capital stock, to provide that the capital stock of a corporation should be kept intact until its dissolution, or so long as there are creditors, and to prohibit the transfer back to the corporation of stock subscribed for by a stockholder unless the capital stock is a real, tangible fund, and in the valuation of property taken in payment for capital stock it is the market value, not an imaginary speculative value that has no reality in existing markets. Thus, I do not think that property which was worth only $100,000 when purchased by a corporation, could be taken in payment of $5,000,000. This magic growth of value in a night outruns the tales of enchantment; and I am of the opinion that the capitalization of the Coal and Iron Company in this case was originally fraudulent. I recognize, however, that creditors who purchased its bonds in good faith should be protected. I merely desire to advert to the fact that an examination of the very voluminous record on this appeal indicates that a large number of the persons who purchased bonds secured by the mortgage paid between fifty and seventy-five per cent. and some as low as twenty-five per cent. of the face value of the bonds, and a large number of them received with each bond double the amount of the bond in capital stock of the company. Thus, stock which had never been paid for was by the corporation given to persons who purchased the bonds.

The fund which the legislature intended and created for
the benefit of all the creditors of the corporation was thus
dissipated, at least, and the purchaser of the bonds should
fairly be chargeable with an observance of fair dealing,
and in some instances in this case the whole of the bond
and stock should be required to meet the liability on the
stock before receiving the money due upon the bond. In
other words, in equity and good conscience, he should not
be permitted to assist some one in avoiding the liability
upon the stock and yet take from the other creditors what
he had paid upon the bond.

I do not deem it necessary to express any further view
upon the facts of the case as now presented to the court.